UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C. A. No. **04**-CV-**11658**-RWZ

Chandrakant S. PANSÉ,                                                          }
                                                                              }
                                                                              }
Anjali Pansé, a minor, through her father & Best Friend Chandrakant Pansé,    }
&                                                                             }
Mihir Pansé, a minor, through his father & Best Friend Chandrakant Pansé,     }
&                                                                             }
Ravi Pansé, a minor, through his father & Best Friend Chandrakant Pansé,   plaintiffs }
                                                                              }
                                                                              }
                                                                              }
v.                                                                            }
                                                                              }
                                                                              }
                                                                              }
Lindsay NORMAN, personally and as President,                                  }
     Massachusetts Bay Community College, ("MBCC"),                           }
&                                                                             }
Paula GASTENVELD, personally and as Vice President, MBCC,                     }
&                                                                             }
Laurie TAYLOR, personally and as employee of MBCC,                           }
&                                                                             }
Ghazi DARKAZALLI, personally and as Dean, Science & Technology, MBCC,         }
&                                                                             }
Thomas SABBAGH, personally and as Assoc. Dean, MBCC,                          }
&                                                                             }
Board of TRUSTEES, MBCC,                                                      }
&                                                                             }
Judith I. GILL, personally and as Chancellor of Higher Education of Mass.     }
&                                                                             }
Peter H. TSAFFARAS, personally and as Assoc. Vice Chancellor of Higher Ed.    }
&                                                                             }
Board of Higher Education (BHE), Commonwealth of Massachusetts,               }
&                                                                             }
John A. KING, Commissioner, Div. of Unemployment Assistance, Mass.,           }
&                                                                             }
Mitt ROMNEY, personally and as Governor of Massachusetts,                     }
&                                                                             }
Andrew SCIBELLI, personally and as Interim President, MBCC,                   }
&                                                                             }
Haidee A. MORRIS, personally and as Community College Counsel,   defendants }


AMENDED COMPLAINT & Demand for Jury Trial

Parties

1. Plaintiff Chandrakant Pansé, *M.Sc.*, *M.A.*, *Ph.D.*, US citizen (hereafter only "plaintiff" or "Pansé" for simplicity unless other plaintiffs are specified), has been a tenured professor in a Science and Technology Division at Massachusetts Bay Community College ("MBCC"), a state college in Wellesley, Massachusetts, till his malicious and fraudulent termination in Summer '02. Since 1990 he has been adjunct faculty at Boston University School of Medicine, where he teaches advanced subjects in a biotechnology ("biotech") program. Anjali Pansé, Mihir Pansé, and Ravi Pansé are his minor children. All plaintiffs reside in Newton, Massachusetts.

2. Information regarding defendants, *infra*, is to the best of plaintiff's knowledge for times relevant for this action.

3. Both Board of Higher Education of Massachusetts ("BHE") and the Board of Trustees of MBCC (including any Committee or Subcommittee of the Board, hereafter collectively "Trustees") are "employer" pursuant to the Collective Bargaining Agreement ("CBA", see Exhibit for relevant extracts) by and between BHE and a faculty bargaining unit (although plaintiff's paychecks bore the signature of the Treasurer of the Commonwealth).

4. At MBCC, Norman, a reject from Montana, found by Trustees and appointed by votes of Trustees and BHE, had been president since Mar. 1999, and retired in Oct. 2004. Scibelli has been interim president since October 2004. Gastenveld was Vice President from Jan. 2001 to Nov. 2002. Darkazali has been Dean since Jan. 2000, and Sabbagh Associate Dean since Oct. 2000, of said Science and Technology Division. Taylor has been Dean/Director of personnel and Affirmative Action Officer at least since 1998.

5. Morris, *Esq.*, is employed by Massachusetts community colleges as General Counsel.

6. Gill and Tsaffaras have been Chancellor and Associate Vice Chancellor, respectively, of Higher Education and employees of defendant BHE.

7. Mr. John King has been Director, Division of Employment and Training, and now Commissioner, Division of Unemployment Assistance (DET/DUA), of this Commonwealth.

8. His Excellency Mr. Mitt Romney has been the Governor of this Commonwealth of Massachusetts.

Jurisdiction

9. Subject Matter Jurisdiction, Arising Under Federal Constitution or Laws: Pursuant to 28

U.S.C. § 1331, this Court has jurisdiction in this action as plaintiffs' claims are based on violations of

(i) plaintiffs' rights under Title VII of the Civil Rights Act of 1964 and its implementing regulations, 42 U.S.C. § 1983 and any other applicable statutes and rules, all applicable to MBCC, Trustees and BHE as they all receive Federal financial assistance, defendants having violated said rights while acting under the color of Massachusetts statutes, ordinances, regulations, custom or usage, *in spite of a written warning by a federal attorney to not retaliate against or intimidate plaintiff, and further to take appropriate steps to prevent any hostile or threatening actions against plaintiff* in view of a pending civil rights complaint and a federal investigation of MBCC pursuant to 34 C.F.R. § 100,

(ii) plaintiff's rights to due process pursuant to Fifth Amendment of Bill of Rights, made applicable to defendants herein by Amendment XIV,

(iii) all plaintiffs' protected property interests in Pansé's tenured professorship pursuant to said Fifth Amendment,

(iv) all plaintiffs' protected liberty interests through Pansé's status in his profession pursuant to said Fifth Amendment,

(v) all plaintiffs' protected property interests in medical, dental and other insurances and other intangibles, whether reduced to writing or otherwise, as provided to all employees of defendants, pursuant to said Amendments, and

(v) plaintiff's free speech rights pursuant to the First Amendment.

10. Jurisdiction Over Parties & Venue Jurisdiction: All actions on which plaintiffs base their claims were committed in Massachusetts, in the course of being an employee of the state or as a result of being such an employee. All plaintiffs and most of the defendants are residents of Massachusetts. Wherefore, this Court has jurisdiction over parties as well as venue jurisdiction.

11. Supplemental Jurisdiction: This Court has supplemental jurisdiction in this action regarding any and all pendent claims under Massachusetts laws per 28 U.S.C. § 1367 (a).

## ALLEGATIONS

12. Plaintiff believes, and therefore avers, each of the allegations *infra*.

13. Plaintiff was employed as associate professor to teach biotech in particular and science in

general at MBCC from August 1993 to Spring 1996, when he was promoted to professor. Employer attempted to block plaintiff's tenure in February 1999 by giving him an 'unsatisfactory' evaluation. Plaintiff sued in State Superior Court pursuant Mass. G. L. c. 149 § 185 (the 'whistleblower' statute) and rights pursuant to the First Amendment.[1] Plaintiff was awarded tenure in Summer 1999, and served until his dismissal in Summer 2002.

14. Beginning in 1993, a professor B. Jackson and plaintiff[2] designed and developed a new and highly innovative program in biotech to replace a non-working program then in existence at MBCC. Five new laboratory "research" courses (later reduced to four), called Rotations I - V after similar curricula in many Ph.D. programs in biological sciences, formed a critical component of said renovated biotech curriculum, advanced level of instruction in sciences in other new courses being another critical part. Community college students, some with prior baccalaureate degrees from elsewhere, at least since 1994 till plaintiff's said dismissal, not only spent long hours, including during nights and weekends and holidays and snow-storms when the college was locked up, in the biotech program laboratory for the purposes of fulfilling the requirements of said rotation research courses, but, with unending encouragement of said two faculty, have also presented their work at research meetings[3]. Not only was the college aware of this nature of instruction in the biotech program,[4] and obtained the necessary approval(s) for said innovative program, but also made arrangements to accommodate program needs and provided encouragement. The National Science Foundation (NSF), an agency of the Federal government, has held up said community college program as a model to be emulated throughout the US.

15. Prof. Jackson, Principle Investigator (PI) and plaintiff, Co-PI, with others, also secured Research Experience for Undergraduates (REU) / Research Opportunities for Minorities

---

[1]In that action, the Superior court denied provisions of plain statutory language as well as holdings of the 1st Circuit of Appeals regarding the whistleblower claims; the Office of the Attorney General of the Commonwealth attempted to obtain discovery long after deadline for conclusion of discovery pursuant to the court's Tracking Order, said deadline having been extended repeatedly, and then filed Reapplications pursuant to Mass. R. Civ. Practice 33a. A Superior court judge, without a hearing, denied plaintiff's Motion to remove said fraudulent Reapplications. *Pansé* v. *Van Winkle* et al., NOCV 99-287.

[2]with assistance from plaintiff's wife, Dr. Mrs. Pansé

[3]Plaintiff testified, in substance, at MBCC that a cure for cancer would not be found at a two-year college; rather, the goal was to get community college students excited about, and knowledgeable in, scientific research.

[4]as indicated by sworn depositions of MBCC officials

(ROMP) grants at MBCC from NSF, totaling over $ 740,000 in seven years, in order to promote the numbers of minorities in sciences. Jackson and plaintiff also secured other grant monies from private Foundations.

16. As a result of their extraordinary efforts, Jackson and plaintiff have enjoyed the unique gratification of seeing most of their community college students, a high percentage of them single mothers, minorities, etc., get advanced degrees in biological sciences or excel in the biotech industry. The prior president of MBCC advised the plaintiff that BHE (or its predecessor, Higher Education Coordination Council) was highly complimentary of said accomplishments. Plaintiff asserts that not many forms of social service can be better than such converting of single mothers and inner city minority youths into high-earnings taxpayers and contributing to the advancement of our country in science and medicine in an increasingly competitive world.

17. Further, after community colleges became eligible to nominate their students (2 per year, each, as opposed to 4 per year for institutions granting baccalaureate or higher degrees) for the Congressional Barry Goldwater Scholarships in Science and Mathematics, 10 students in the innovative Jackson-Pansé community-college-program won the honor in 7 years, a fete surpassed only by the likes of Princetons, MITs and Stanfords of this world.

18. During his employment, plaintiff, driven by a quest for academic excellence, had been outspoken regarding the nature and level of education imparted by community colleges (as amply illustrated by the disrepute in which stands the community college education), and administrative issues therein, and dire needs for improvements in said areas. Norman, similarly to the MBCC president he replaced, had explicitly expressed his displeasure at said protected activities, failed in his duties to provide the plaintiff a secure atmosphere conducive for academic work, harassed him, and engaged in undue retaliation. Similarly, Gastenveld, Darkazalli and Sabbagh, just as their predecessors, engaged in undue harassment of and retaliation against the plaintiff.

19. In 2001, Jackson[5], PI, filed complaints with the Office for Civil Rights in US Department of Education for MBCC's refusal to fairly administer the federal grant and for retaliation, based on race, and an attorney in said Office issued the written warning, *supra*, to refrain from retaliation or intimidation. Plaintiff cooperated fully with an ensuing federal investigation.

---

[5]Jackson, an African-American and also a tenured professor, was also terminated by MBCC in Summer '02 on the grounds of similar student complaints.

20. MBCC then proceeded to the most bizarre act of refusing to accept the federal monies for bettering the science education of minority students. Norman, meeting with students, lied regarding his actions therein. Some of the defendants herein were directly involved in said despicable act of abrogation of the federal goal of increasing the number of minority persons in scientific fields; others knew or should have known of said despicable act, as the most prominent newspaper in New England, viz., the Boston Globe, covered this issue.

21. In Spring 2002, some students, unwilling and/or unable to gain from the extraordinary opportunities awaiting them[6], complained to Darkazalli and/or Sabbagh regarding the nature and practices in the research rotation course being taught by the plaintiff. Instead of honoring plaintiff's demands to follow a student-grievance procedure, in existence at the college as the exclusive means to handle student complaints, and instead of relying on said procedure particularly in light of the federal warning, *supra*, and in spite of the resulting necessity to stay away from even any appearance of retaliation or intimidation in view of said federal warning, Darkazalli and Sabbagh, under the direction of and/or in conspiracy with Norman, Gastenveld and Taylor, set out to employ said student complaints for their purposes of retaliation or intimidation and/or furthering their conspiracy to retaliate or intimidate.

22. Plaintiff explained to Darkazalli, Sabbagh, Gastenveld and Taylor what the past practices in the rotation classes had been and how said practices had yielded wonderful results and how the College not only approved said practices but encouraged them; said defendants acknowledged said explanations. Gastenveld and Taylor denied plaintiff his right to representation/advisor at a meeting held for the purposes of providing said explanation on or about 4-29-2002.

23. Darkazalli and Sabbagh produced a report, malicious and fraudulent in part, from a purported investigation of said one class taught by plaintiff; Darkazalli and Gastenveld forwarded to Norman a malicious and fraudulent recommendation, based on lies, to dismiss plaintiff from employment at MBCC, all in furtherance of said retaliation and/or a conspiracy to retaliate, where the most retaliation they could possibly justify was either to direct plaintiff to change the

---

[6]"I do suggest to students that schools, whether they be high schools, community colleges, or universities, do not provide an education. They can only provide an educational opportunity for their students. Each student decides what he or she does with the opportunity."
　　　　　　-William M. Bulger, *Esq.*, President, University of Massachusetts. From "*College is a given. Now, tell them how to get there*," the Boston Sunday Globe, Education Section, Dec. 26, 1999.

innovative and highly successful research methods in the biotech program or to assign plaintiff to courses about which defendants had no questions (i.e., classes other than the research rotations).

24. Defendants failed to notify plaintiff per Article 11.02 (I) (A) (2) of the CBA (please see Exhibit), made applicable to the termination process by Article 15.01 of the CBA, viz., notice before Oct. 15 in the (academic) year of termination, in extraordinarily grievous and gross violations of the CBA as well as plaintiff's federal and state due process rights, both procedural and substantial.

25. On or about 5-21-2002, Taylor had the notice of MBCC's charges served at plaintiffs' home, allegedly intentionally, in a shocking and offensive and humiliating and manner.

26. In a letter dated 6-02-02 to Gill, Norman alerted her that "*we* have determined" that two tenured professors, "one a black and the other Indian", had failed in their teaching duties, and the College was "taking action to terminate the employment of the two professors" (emphasis added).

27. In order to satisfy Article XV of the CBA, Norman et al. conducted a sham hearing to reach their goal, present in conspiracy. cf Paragraph 26. On Friday 5-31-02 at about 5 p.m., Taylor handed the plaintiff a notice of a hearing being scheduled on the next Friday, 6-7-02, all deliberately designed to allow the plaintiff no more than 4 working days to seek and retain counsel and secure witnesses; said hearing was subsequently held on July 29 and 30, 2002. For any hearing for the dismissal of plaintiff from a tenured position, a matter of extraordinary proportions for the society at large, any political views of any of the defendants regarding the system of tenure notwithstanding, plaintiff enjoyed significant rights of due process. Norman denied plaintiff due process, both substantive and procedural, by failing to answer in advance queries regarding procedures to be followed at the hearing, and/or not producing documents requested for defense, and/or by not allowing adequate opportunity for plaintiff's counsel to prepare defense(s), and/or by not allowing adequate opportunity for plaintiff to secure witnesses, and/or by refusing to recuse himself from the hearing as a party in litigation with the plaintiff and thus incompetent to judge the plaintiff in an impartial manner, and in other ways such as not admitting evidence favorable to plaintiff, making a complete farce of said hearing.

28. At said hearing at which plaintiff's methods of teaching, in accordance with past practices at MBCC and with full knowledge of MBCC, in only one specific biotech rotation, *supra*, was in question, and where Norman, as the hearing officer, held,

"The issue concerning Dr. Panse's termination, depending on the outcome of this hearing and the decision that I render based on what I hear during this hearing, may or may not determine whether Dr. Panse is an instructor in one of those classes beginning Sept. 3, ..."

Norman could at most instruct Gastenveld, Darkazalli and Sabbagh to assign the plaintiff non-rotation non-research classes and had no rationale for recommending termination of plaintiff's employment to the employer.

29. Gastenveld, Darkazalli and Sabbagh all lied under oath at said hearing.

30. Norman took no written notes whatsoever of any testimony at any time at said hearing. In spite of undisputed evidence of plaintiff teaching in accordance with nothing other than approved prior practices, with the college and the society at large having enjoyed unprecedented and magnificent successes from plaintiff's teaching, and in absence of any document to demonstrate that the college had at any time asked the plaintiff to change any of said practices, Norman, in less than 24 hours after conclusion of said hearing, and with no heed to the federal warning, *supra*, communicated his decision, preset in conspiracy, to dismiss plaintiff to Trustees.

31. Where Norman had authority per CBA Article 15.02 (2) to only recommend dismissal (to the employer), and where the due process only went so far as to put the plaintiff on notice for only a recommendation for dismissal, Norman abused due process and dismissed plaintiff. Tsaffaras, Gill, BHE and Trustees allowed, and participated in, said abuse.

32. An appeal to Gill, as Chancellor of Higher Education (and not to the Trustees), ensued pursuant to the CBA. The Chancellor being unconcerned with a matter most serious for academia in particular and the society in general, viz., dismissal of a tenured professor, and a professor of extraordinary accomplishments no less, said appeal was heard by Tsaffaras, who openly expressed surprise at the entire affair and professed that he would consult repeatedly with Gill. Tsaffaras, Gill and BHE knew or should have known that charges against plaintiff were without any substance whatsoever and that plaintiff was offered no due process, and further that the entire affair was no more than illegal retaliation. However, Tsaffaras, was seen huddled with Taylor and Morris at the conclusion of said appeal hearing, allegedly to join the conspiracy to retaliate. Tsaffaras, Gill and BHE upheld the illegal action of dismissal and retaliation.

33. To the extent that the Trustees can be construed as the employer, the Trustees, pursuant to their Bylaws, were required to examine the actions of Norman in termination of a tenured faculty on the grounds of serious misconduct and upon conduct of due process, and had no

provision in the Bylaws for not fulfilling said requirement. Further, a vote of the entire Board of Trustees was required for any action so grievous as termination of a tenured faculty due to serious misconduct. Trustees failed entirely on such counts, allegedly in the conspiracy with other defendants to retaliate, and have been grievously derelict in their fiduciary duty to MBCC.

34. Taylor, in furtherance of said retaliation and/or of conspiracy to retaliate, denying the plaintiff the opportunity to recover certain of his personal and intellectual property from his office upon said fraudulent "dismissal", ordered and supervised the cleaning out of plaintiff's desk and office, and thus violated plaintiff's privacy, and caused significant loss of said property, and caused humiliation of plaintiff, all very intentionally.

35. Taylor, in furtherance of the said retaliation and/or of conspiracy to retaliate, interfered with plaintiff's rights to unemployment insurance by claiming fraudulently to DET/DUA that plaintiff was terminated for misconduct, and lied under oath in attempt to harm plaintiff at a DET/DUA appeal hearing. After a hearing officer upheld plaintiff's appeal, unidentified employees of DET/DUA, recklessly or negligently or in conspiracy with some of the defendants, failed to furnish the plaintiff his benefits in any kind of timely fashion.[7]

36. Parties have been in arbitration pursuant to the CBA, where Article X limits the Arbitrator's authority to awarding only reinstatement and back-pay. This action, however, is neither precluded by the arbitration process nor is untimely[8].

37. Norman, Gastenveld, Darkazalli, Sabbagh and former MBCC president Van Winkle all lied under oath at the arbitration.

38. Morris did everything possible to prolong the arbitration proceedings beyond two years (e.g., rejecting all possible dates in a six month period in '03-'04) as part of the retaliation scheme, and produced a number of plaintiff's students as witnesses for MBCC, each of whom contradicted himself/herself under oath. Morris attempted to mislead the Arbitrator regarding MBCC refusing to accept NSF monies. Further, in attempts to intimidate plaintiff's witness, she allegedly misled a Judge of the Superior Court in a separate action by that witness to stop his academic records from being introduced at arbitration in violation of FERPA.

---

[7]until a kind soul in Pittsfield, far away from the Eastern conspiracy, facilitated plaintiff's claims close to Christmas Eve of 2003, thereby saving the Division from further damage.

[8]cf. *Blanchette* v. *School Committee of Westwood*, 427 Mass. 176 (1998).

39. On 4-17-2003, the Arbitrator suggested[9], in substance, that MBCC's actions were unjustified and MBCC should therefore "settle". Morris responded by producing Gastenveld to lie wildly under oath on the next scheduled day (viz., 8-1-2003). The Arbitrator repeated his said observation and suggestion on 2-04-2004.[10]

40. In his written decision, conveyed on 11-10-2004, *the Arbitrator held that MBCC could not even justify any discipline against the plaintiff, "much less to discharge" him.*[11] The Arbitrator did not even mention the written federal warning, *supra*, although it was in the evidence before him.

41. Scibelli knew that there existed a weighty federal warning, as well as allegations amounting to fraud with malice regarding the termination of plaintiff. On 11-10-04, Scibelli knew or should have known of the Arbitrator's holding. Yet, on Pearl Harbor Day, 12-07-04, he conducted a sham "settlement conference", also attended by Taylor and Morris; said conference was over almost before the parties had settled in their chairs. On 12-08-04, Scibelli conveyed his decision to continue the fraudulent termination of plaintiff and formally sealed his participation in the defendants' malicious conspiracy.

42. On 12-08-04, AG's Office, representing the defendants in their official capacities, communicated its position to the plaintiff, in writing, "... As a matter of modesty and efficiency, I'd suggest you *(plaintiff)* (sic) now go back to your students and your lab.... " *(emphasis and material in parentheses added)*, i.e., in substance, the wrongfully dismissed plaintiff be reinstated at once. To which the plaintiff could only respond, "I could think of going back to my students and my lab, as you suggest, if your morally challenged clients herein would let me."[12]

---

[9]in an action equivalent to a *sua sponte* directed verdict

[10]After Morris rejected proposed hearing dates in 2002, the Arbitrator held *12* days of hearing, where numerous witnesses were produced, starting 1-28-03 and ending 5-07-04. Dates in April and May 2004 were agreed to only when the Arbitrator in early 2004 declared that he did not want to see this matter in July 2004. The Arbitrator had set 7-12-04 as the deadline for parties to submit briefs for closing arguments, allowing 66 days for said writing. The briefs, however, were not submitted till on or about 9-20-04, 4½ months after close of evidence.

[11]The Arbitrator, outside the formal hearing process, repeatedly referred to his work as a business. As prudent businessmen, Arbitrators try to demonstrate balance and refrain from making findings greatly favoring any one party, trying their best to avoid upsetting a party.

[12]Also from the AG's: "The world may be, as you *(plaintiff)* say, a nasty place, but I see no reason to make it nastier than necessary" *(parentheses added for clarity)*. In substance, drop your lawsuit.
   Plaintiff's response, in exasperation: "Plaintiffs give up their legitimate claims in the name of controlling

43. His Excellency Mr. Mitt Romney knew, or should have known, that there existed a weighty federal warning, as well as allegations amounting to fraud with malice against his administration, and the Arbitrator's holding. Mr. Romney, pursuant to oath of his Office, has thus himself owed a duty to the plaintiffs to direct those defendants, appointed by and answerable to the Governor, to stop any and all retaliatory schemes and reinstate the plaintiff at once, and should said orders not be carried out, to dismiss said defendants for misconduct and appoint individuals who would not be so devoid of morality and the will to obey the laws. Mr. Romney[13] has failed in said duties to plaintiffs, either intentionally, or recklessly, or negligently, causing harm to the plaintiffs.

44. Defendants' conduct was a result of their collective belief that they, represented by an unethical Office of the state's A. G. (see Footnote 1), could not lose in the state's courts. The AG's Office, further, in the action herein, attempted to intimidate and/or humiliate the plaintiff by writing to him, in substance, that the plaintiff is greedy and vindictive to seek justice. Said Office also threatened, in writing, to employ delaying tactics in this Federal Court by means of a possibly fraudulent motion.

45. Extraordinarily outrageous actions by state officials acting under the color of law against an extraordinary educator and public servant, where the Arbitrator held that there existed grounds for absolutely no action whatsoever and where there has been a federal warning, with lies under oath by high state officials and repeated misconduct by the Office of the state Attorney General, and the resultant destruction of an exemplary program in education that was to be a national model, also constitute fraud upon the society.[14]

46. Retaliatory and outrageous actions of defendants, in violations of the Constitution and the laws and federal warning, whether with malice or otherwise, fraudulent and/or intentional and/or reckless and/or negligent, caused the plaintiff to suffer from grave humiliation in his profession, in his neighborhood, in the community and in the society, from apprehension of such humiliation, and resulted in infliction of severe emotional distress and resulting physical ills, and

---

nastiness, in order that defendants can feel less restrained to perpetuate their frauds. Brilliant. Absolutely brilliant."

[13]who has been less than complimentary of the state college faculty in his public pronouncements

[14]This is the material, stranger than fiction, which best-selling books and blockbuster movies are made of.

loss of critical insurance for dental and medical care; and caused plaintiffs Anjali, Mihir and Ravi Pansé, plaintiff's dependants, to suffer from loss of critical insurance for dental and medical care, and humiliation and emotional distress.  Plaintiff also suffered from loss of consortium with his minor children, and said minor children suffered from loss of consortium with their father. Plaintiffs also suffered economic damages, due to causes such as, but not limited to, inability to refinance their mortgage when interest rates were at record lows, inability to have deferred compensation invested in equities when the stock markets were low, interest on loans, including credit card balances, and the resulting poor credit rating.

47. Plaintiffs also assert that defendants Trustees and BHE were negligent in appointing Norman and in inadequate supervision of him, and that the Governor of this Commonwealth knew or should have known the misdeeds at MBCC and by Trustees, BHE and Gill.

48. As the Supreme Court of another major industrialized state, viz., New Jersey, held more than half a decade ago,

> "In this day and age, in this society and culture, and in this State, an ugly, vicious racial slur by a high-ranking public official, who should know better and is required to do better, cannot, in light of this State's strong and steadfast public policy against invidious discrimination, be viewed as a picayune insult. That view would be blind and impervious to the lessons of history."[15]

That holding was about one slur by one official, directed towards one person, *after* said official had offered an apology.  In the instant case, there is an army of high-ranking state officials, aided and abated by an unethical Office of the AG, who would rather not administer federal monies and thus would rather deny opportunities in science education to minority students, and would rather ignore due process and a federal civil rights warning, and would rather retaliate.  The acts of these officials amount to not one slur, but speak volumes, some of which caused outrage amongst the legislators of the tiny Black Caucus on the Beacon Hill of this Commonwealth.[16]

49. In view of the moral outrage as exhibited by defendants, plaintiff respectfully submits that injunctive relief, as deemed appropriate by this Hon. Court, is called for to further the interests of our society and our country.

---

[15]*Taylor v. Metzger*, 706 A.2d 685, 694 (1998).

[16]Said legislators, however, apparently lacked political capital and clout to take any meaningful steps.

50. Plaintiffs will need to further amend this Amended Complaint upon conclusion of the arbitration process, to add counts pursuant to Mass. Gen. L. c. 149 § 185 (the so-called "whistle-blower" statute), since invoking said statue would result in forced termination of arbitration.[17]

## Count One

Assault & Battery per 42 U.S.C. § 1983, Pansés v. Norman, Gastenveld, Taylor, Darkazalli, Sabbagh, Gill, Tsaffaras, Romney, Morris & Scibelli, in personal capacities

51. Plaintiffs repeat and incorporate by reference herein each and all allegations contained in paragraphs 1-50, *supra*, as if set forth separately.

52. Plaintiffs allege that defendants acting under the color of state laws, with or without actual malice, intended to illegally snatch away[18], or knew with substantial certainty that they would be unduly depriving the plaintiffs of, plaintiffs' medial and dental insurance. This constituted assault on plaintiffs for every incidence of apprehension of need of medical or dental care for any of the plaintiffs, and the resulting humiliation and physical harm amounted to unconsented to touching and hence battery with transferred intent, upon plaintiffs by defendants.

53. Plaintiffs also allege that with defendants acting under the color of state laws, with or without actual malice, intended to snatch away, or knew with substantial certainty that they would be unduly depriving the plaintiffs of, their medial and dental insurance. The resulting humiliation and physical harm from every incidence of need of medical or dental care for any of the plaintiffs constituted unconsented to touching and hence battery on plaintiffs, and the apprehension thereof an assault for each instance of said battery, by defendants.

54. Wherefore, all plaintiffs respectfully demand judgements against said defendants in order to be made whole again, including, but not limited to costs, lawyer's fees and interest, as well as lawful punitive damages.

## Count Two

IIED per 42 U.S.C. § 1983, Pansés v. Norman, Gastenveld, Taylor, Darkazalli, Sabbagh, Gill, Tsaffaras, Romney, Morris & Scibelli, in personal capacities

---

[17]M. G. L. c. 149 § 185 (f).

[18]cf. *Fisher v. Carrousel Motor Hotel*, 424 S.W.2d 627 (Tex. 1967).

55.  Plaintiffs repeat and incorporate by reference herein each and all allegations contained in paragraphs 1-50, *supra*, as if set forth separately.

56.  Plaintiffs allege that defendants, acting under the color of state laws, with or without actual malice, intended to inflict upon the plaintiffs severe emotional distress by their outrageous[19] and offensive[20] and persistent behavior, or knew with substantial certainty that such behavior would inflict upon the plaintiffs severe emotional distress, due to loss of employment, economic hardship, lack of medical and dental insurance, and the resulting humiliation[21]. Plaintiffs did in fact suffer from severe emotional distress, and consequent physical injuries, as a result of said causes.

57.  Wherefore, all plaintiffs respectfully demand judgements against said defendants in order to be made whole again, including, but not limited to costs, lawyer's fees and interest, as well as lawful punitive damages

Count Three

Violations of Due Process and Constitutional Rights, Conversion/Loss

58.  Plaintiff repeats and incorporates by reference herein each and all allegations contained in paragraphs 1-50, *supra*, as if set forth separately.

59.  Plaintiffs allege that the defendants denied plaintiff dues process, both substantive and procedural, and without any immunity or any other privilege to do so.  The Arbitrator's holding necessarily proves such lack of due process.  Plaintiffs also claim retaliation and denial of his

---

[19]An attempt to intentionally shock and harm a person's peace of mind by invading the person's mental or emotional tranquility constitutes extreme and outrageous behavior, as such behavior may be beyond all possible bounds of decency and may be utterly intolerable in a civilized community. *Boyle* v. *Wenk*, 378 Mass. 592, 595 (1979). Further, the defendant's repeated actions can be considered in their totality, rather than individually, in order to determine if the defendant's behavior led merely to bad manners and hurt feelings, or was extreme and outrageous conduct. *Id.*

[20]Massachusetts State Senate President, The Hon. Mr. Robert E. Travaglini, speaking at the JFK Library in Boston, on or about 11-16-2004, labeled the lack of health insurance for *any* resident of Massachusetts to be "a moral failing" and "morally unacceptable for a society"; media reports indicate that defendant His Excellency Mr. Romney and State House Speaker The Hon. Mr. Salvatore F. DiMasi concurred, and further that said political leadership will redouble their efforts to correct said moral wrong.

[21]No consequential physical ills required. *Agis* v. *Howard Johnson Co.*, 371 Mass. 140 (1976).

First Amendment rights to free speech, his Fifth Amendment rights to property and liberty interests, as well as his rights pursuant to the Massachusetts Constitution, Part the First, Declaration of Rights, Articles 1, 10 and 29. This resulted in conversion, or alternatively losses, of plaintiff's property and interests, some of which the Arbitrator is not empowered to order compensation for, including but not limited to, lost fringe benefits and resultant physical injuries, and other injuries described and economic losses. Plaintiffs claim all damages for which the Arbitrator cannot or would not order recovery.

60. Wherefore, plaintiff respectfully demand judgements in order to be made whole again, including, but not limited to costs, lawyer's fees and interest, as well as lawful punitive damages.

## Count Four

Defamation per 42 U.S.C. § 1983, Pansés v. Norman, Gastenveld, Taylor,
Darkazalli, Sabbagh, Gill, Tsaffaras, Romney, Morris & Scibelli, in personal capacities

61. Plaintiffs repeat and incorporate by reference herein each and all allegations contained in paragraphs 1-50, *supra*, as if set forth separately.

62. Plaintiffs allege that defendants, acting under the color of state laws, with or without actual malice, intended to defame the plaintiffs, or knew with substantial certainty that undue termination of plaintiff's employment would cause the plaintiffs to be defamed. Plaintiffs claim that such severe defamation did actually result due to plaintiff's loss of his employment.

63. Wherefore, all plaintiffs respectfully demand judgements against said defendants in order to be made whole again, including, but not limited to costs, lawyer's fees and interest, as well as lawful punitive damages.

## Count Five

Battery and Assault per 42 U.S.C. § 1983, Pansés v. Taylor in personal capacity

64. Plaintiffs repeat and incorporate by reference herein each and all allegations contained in paragraphs 1-50, *supra*, as if set forth separately.

65. Plaintiffs allege that Taylor, acting under the color of state laws, alone or with other

unidentified individuals, with or without actual malice, intended to deliver the very first notice of the defendants' illegal intentions with a 'bang', and arranged for said delivery to be made in an unconsented to and offensive manner, or knew with substantial certainty that the delivery she arranged would be offensive and in a manner unconsented to.  Taylor thereby committed battery upon the plaintiffs, and assault by the apprehension thereof.

66.  Wherefore, all plaintiffs respectfully demand judgements against Taylor in order to be made whole again, including, but not limited to costs, lawyer's fees and interest, as well as lawful punitive damages.


## Count Six

Conversion and Invasion of Privacy per 42 U.S.C. § 1983,  Pansé v. Taylor, personal capacity


67.  Plaintiff repeats and incorporates by reference herein each and all allegations contained in paragraphs 1-50, *supra*, as if set forth separately.

68.  Plaintiff alleges that Taylor, acting under the color of state laws, alone or with other unidentified individuals, with or without actual malice, ordered and supervised removal, packing in boxes, and partial destruction of plaintiff's personal property, including but not limited to artwork produced by plaintiff's kids and displayed on office walls and plaintiff's computer, all without opportunity for plaintiff to remove his belongings or notice to or knowledge of plaintiff. Taylor thus intended to violate plaintiff's privacy and cause destruction of his property, or knew with substantial certainty that such would be the results of her actions. Taylor thereby committed conversion and invasion of plaintiff's privacy.

69.  Wherefore, plaintiff respectfully demand judgements against Taylor in order to be made whole again, including, but not limited to costs, lawyer's fees and interest, as well as lawful punitive damages.


## Count Seven

Alternatively Negligence per 42 U.S.C. § 1983, Pansés v.  Norman, Gastenveld, Taylor, Darkazalli, Sabbagh, Gill, Tsaffaras, Romney, Morris & Scibelli, in personal capacities

70. Plaintiffs repeat and incorporate by reference herein each and all allegations contained in paragraphs 1-50, *supra*, as if set forth separately.

71. Alternatively to the intentional torts in above Counts, plaintiffs claim that the defendants owed them certain duties, particularly in view of the special relationships existing amongst the parties, that defendants, acting under the color of state laws, breached those duties, that plaintiffs suffered injuries and damages, and further that defendants' conduct was a cause in fact and proximate cause of plaintiffs' damages.

72. Wherefore, all plaintiffs respectfully demand judgements against said defendants in order to be made whole again, including, but not limited to costs, lawyer's fees and interest, as well as lawful punitive damages.

## Count Eight, Pansée v. DET/DUA

73. Plaintiffs repeat and incorporate by reference herein each and all allegations contained in paragraphs 1-50, *supra*, as if set forth separately.

74. Plaintiffs claim that DET/DUA owed them the duties of due process prompt and timely payments of unemployment benefits, particularly in view of the special relationship existing amongst the parties, that defendants breached those duties, that plaintiffs suffered damages, and further that defendant's conduct was a cause in fact and proximate cause of plaintiffs' damages.

75. Wherefore, the plaintiffs respectfully demand judgements against said defendants in order to be made whole again.

## Count Nine, Injunctive and Special Court Orders

76. Plaintiffs repeat and incorporate by reference herein each and all allegations contained in paragraphs 1-50, *supra*, as if set forth separately.

77. Plaintiff respectfully demands judicial remedies, as this Hon. Court deems appropriate, such as a Court Order to the Governor to dismiss members of BHE and Trustees and the Chancellor, all answerable to him, and appoint new and responsible individuals to those bodies, for the purposes of the educational and noble goals of plaintiff and for the causes of justice and

for the betterment of the society. Plaintiffs also seek injunctive relief to stop all future retaliation or intimidation or harassment or any undue action towards the plaintiff by any of the defendants.

### Demand for Justice

78. Plaintiffs respectfully demand justice as in Counts, *infra*. Where any claims of any plaintiff are determined to be in duplicate, plaintiffs pray for recovery pursuant to causes of action which would maximize recovery.

### Jury Trial

79. Plaintiffs claim Trial by Jury on all counts so triable.

### Verification

I have prepared myself and read the foregoing and know the contents thereof, and the same is true of my own knowledge, except as to the matters stated therein on information and belief, and as to those matters I believe them to be true.

Respectfully submitted, this 18th day of December, 2004,

Chandrakant S. Pansé, *pro se*
34 Frances Street
Newton Highlands, MA 02461-1608
Tel. 617-527-9283

Anjali Pansé, a minor, through
her father & Best Friend Chandrakant Pansé

Mihir Pansé, a minor, through
his father & Best Friend Chandrakant Pansé

Ravi Pansé, a minor, through
his father & Best Friend Chandrakant Pansé

**EXHIBIT**

**AGREEMENT ("CBA")**
(relevant parts only; in its entirety at http://mccc-union.org/CONTRACTS/Day/Agreement_99-02.pdf)
by and between
**The Board of higher Education** and the **Massachusetts Community College Council**

July 1, 1999 through June 30, 2002; extended to June 30, 2003 by July 2002 Memorandum

## ARTICLE X - Grievance Procedure

### 10.01 Intent of the Parties

It is the intent of the parties to this Agreement to use their best efforts to encourage the informal and prompt settlement of grievances which may arise between the Association or a member or members of the bargaining unit and the Employer. In recognition of this intent, the parties agree that they shall use the procedure set forth in this Article for the resolution, strictly pursuant to the terms of this Agreement, of all disputes involving the application of this Agreement; provided, however, that disputes involving the application of Article XIIIA (Post-Tenure Review) shall be governed by the provisions of that Article. ... The Association further agrees that it shall not initiate proceedings in any other forum in respect of any matter that is or may become the subject of a grievance as hereinbefore defined until it shall have first exhausted the procedures provided herein.

### 10.06 Step Three - Arbitration

A. ... arbitration of a grievance may be initiated in accordance with the following provisions:

1. The Association shall have the exclusive right to initiate arbitration of a grievance. The decision or award of the arbitrator shall be final and binding for the Association, the employee and the Employer in accordance with applicable provisions of state law.
2. The Association may initiate arbitration of a grievance only if the resolution of the grievance has been duly authorized by the Association and so certified by the President of the Association or the President's designee.
3. The Association shall initiate arbitration by filing a demand for arbitration with the American Arbitration Association and with the Chancellor or Chancellor's designee within forty (40) calendar days of receipt of the notice pursuant to 10.05G2.
4. Such arbitration shall be conducted in accordance with the rules and regulations of the American Arbitration Association in effect on the date of said submission, unless otherwise provided herein; provided, however, that the jurisdiction of the arbitrator to inquire into any issue or to render any award is governed solely by the provisions of this Agreement.

B. Limit of the Arbitrator's Jurisdiction

Subject to the provisions of this Agreement, the arbitrator shall have no authority or jurisdiction to:
1. Arbitrate such portion of any grievance which is removed from the jurisdiction of the Arbitrator by the express terms of this Agreement.
2. Add to, alter or amend any terms or conditions of this Agreement.
3. Inquire into or arbitrate any issue not presented by the original complaint as amended at Step Two.

C. Authority of the Arbitrator

Unless otherwise provided in this Agreement, the arbitrator shall have the authority to make a final and binding award on any dispute concerning the interpretation or application of this Agreement. The arbitrator's authority in matters which are arbitrable is limited to a determination as to whether the provisions set forth in this Agreement were violated; provided that in matters of professional judgment, the arbitrator shall determine whether the application of such to the grievant has been arbitrary, capricious or unreasonable. Beyond such determination, the arbitrator shall be without power, right or authority to make a decision or to substitute the arbitrator's judgment for that of the Employer or its representatives, except as otherwise provided in this Agreement. The arbitrator shall have no authority to arbitrate:
1. Any incident which occurred or failed to occur prior to the ratification date of this Agreement.
2. The failure or refusal by the Employer to renew the contract of or to reappoint a unit member in the first (1st) three (3) years of regular appointments.
3. Affirmative Action/Discrimination.
4. Basis for retrenchment.

D. Award of Arbitrator

If the arbitrator determines no express provision of this Agreement has been breached in its application to the grievant as claimed, the arbitrator shall dismiss the grievance. If the arbitrator determines that this Agreement has been so breached, the arbitrator may, subject to the provisions of this Article and except as hereinafter provided, provide an appropriate remedy for the breach; provided, however, that in making any monetary award, the arbitrator shall only provide compensation for actual damages directly attributable to such breach, and shall in no event make any award by way of penal damages.

E. Dismissal and Retrenchment

If a unit member's employment is discontinued as a result of dismissal or retrenchment, and the arbitrator determines based on clear and convincing evidence that the decision of the President of the College or the President's designee was arbitrary, capricious or unreasonable, the arbitrator shall remand the matter for reassessment by the President of the College or the President's designee of the original decision but shall not have the result or effect of granting any binding award, provided however, that a part-time unit member shall have no right to grieve or arbitrate retrenchment decisions. After remand, the President of the College or the President's designee shall have thirty (30) days to render a new decision. If the grievant believes the decision of the President of the College or the President's designee on remand is arbitrary, capricious or unreasonable, the grievant may file an appeal to the original arbitrator (if the original arbitrator is unable to hear the case, the parties shall choose a new arbitrator according to the terms of this Agreement) in accordance with the provisions of this Article. On appeal, if the arbitrator determines based on clear and convincing evidence, that the decision of the President of the College or the President's designee is arbitrary, capricious or unreasonable, the arbitrator shall have the power to make the grievant whole; provided, however, that any monetary award shall be reduced by way of mitigation by an amount equal to the total income received by the grievant during the period for which monetary damages are so awarded. ...

G. Notwithstanding any rule of the American Arbitration Association to the contrary, in making a decision, the arbitrator shall apply the express provisions of this Agreement and shall not alter, amend, extend or revise any term or condition hereof.

**Article XI ARTICLE XI - Appointment and Reappointment - Tenure**

*11.02 Reappointment and Non-Reappointment of Regular Appointments*

l. Full-time faculty or professional staff hired prior to the date of execution of this Agreement shall be governed by paragraphs A and B below

A. The non-reappointment of a full-time faculty or professional staff member shall be in accordance with the following procedures:
1. Termination at the end of the first (1st) through third (3rd) years of service; notice provided by February 15th of that year of service;
2. Termination at the end of the fourth (4th) year of service or later; notice provided by October 15 of the year of termination.

B. ... For the fourth (4th) year of regular appointment, the notice of non-reappointment of non-tenured units members shall be subject to the exercise of professional judgement. Such notice shall contain a statement of reasons in writing. Termination in the fourth (4th) year or later of unit members paid from non-state appropriated funds shall be accompanied by a statement of reasons; provided, however, that no statement shall be required if non-reappointment is due to insufficient funds or to the terms of and conditions of the non-state appropriated funding source and provided further that said non-reappointment shall be grievable to Step Two and shall be subject but not arbitrable to the exercise of professional judgement and whether application to the grievant was arbitrary, capricious or unreasonable.

II. Full-time faculty or professional staff hired subsequent to the date of execution of this Agreement shall be governed by paragraphs A and B below:

A. The non-reappointment of a full-time faculty or professional staff member shall be in accordance with the following procedures:
1. Termination at the end of the first (1st) through fourth (4th) year of service; notice provided by March 1 of that year of service;
2. Termination at the end of the fifth (5th) year of service or later; notice provided by October 15 of the year of termination.

B. Non-reappointment of a unit member on a regular appointment in the first (1st) four (4) years shall be without cause, except for written notice requirements required in Section 11.02. Reasons may be provided at the discretion of the President of the College; neither the reasons nor the decision shall be subject to the grievance procedure. For the fourth (4th) year of regular appointment, the notice of non-reappointment of non-tenured unit members shall be subject to the exercise of professional judgment. Such notice shall contain a statement of reasons in writing. Termination in the fourth (4th) year or later of unit members paid from non-state appropriated funds shall be accompanied by a statement of reasons; provided, however, that no statement shall be required if non-reappointment is due to insufficient funds or to the terms and conditions of the non-state appropriated funding source and provided further that said non-reappointment shall be grievable to step two and shall be subject but not arbitrable to the exercise of professional judgment and whether application to the grievant was arbitrary, capricious or unreasonable.

III. Paragraphs A, B, C and D shall be of application to faculty and professional staff in the foregoing Section I and II.

A. Termination of a unit member in that unit member's fifth (5th) regular appointment or later shall be for just cause.

B. Notice shall be in writing given by the President of the College or the President's designee. Any unit member holding a regular appointment who does not receive such notice shall be entitled to inquire of the President of the College as to the failure to give notice. The President of the College or the President's designee shall respond to the inquiry within fourteen (14) calendar days.

C. Failure to give notice of reappointment shall not prohibit reappointment of the unit member. Failure to give proper notice shall constitute reappointment of the unit member for one (1) academic or calendar year, whichever is applicable, but shall not thereby entitle the unit member concerned to academic tenure, to any further appointment with or without academic tenure, or to further notice of non-reappointment.

D. Each unit member holding a regular appointment shall notify the President of the College in writing of that unit member's intent to accept or reject a reappointment within thirty (30) days after receipt of notice of reappointment. Failure by the unit member to notify the President of the College of acceptance shall constitute a rejection of reappointment.


**ARTICLE XV - Termination, Dismissal, Discipline & Resignation**

*15.01 Termination*

Due notice of intention of the College to terminate a unit member must be provided in accordance with Article XI.

*15.02 Dismissal*

Dismissal is defined as the discharging of a unit member for just cause prior to the expiration of that unit member's appointment and shall not be invoked except through due process.

1. Charges relating to dismissal must be filed with the President of the College and may be filed only by the appropriate administrator, to whom the individual is responsible, except that charges may also be made by the President of the College.

2. The President of the College shall notify the unit member that the unit member shall be recommended for dismissal, and, if appropriate request is made, the dismissal shall be preceded by a discussion with the President of the College. The matter may be concluded by mutual consent of the parties at this point.

3. a. If the matter is not concluded, the President of the College shall frame with reasonable particularity a formal statement of charges and shall serve the statement of charges upon the unit member. The unit member may be represented by the Association.
b. Within ten (10) days of the service of the statement of charges upon the unit member, the unit member shall indicate in writing whether the unit member requests a formal hearing. If no such request is received within ten (10) days, it shall be presumed that the unit member waives that unit member's right to a hearing.

4. The President of the College shall conduct the hearing, if held.

5. During the hearing, the unit member shall be entitled to have counsel of that unit member's choice which may include representation by the Association.

6. A verbatim record of the hearing shall be taken and a copy shall be made available to the unit member at that unit member's request for inspection and copying; provided that the Employer and the Association shall share the cost of providing a copy of the transcript to the unit member.

7. a. The unit member shall be afforded an opportunity to obtain necessary witnesses and documentary evidence and the President of the College shall to the extent practicable secure the cooperation of such witnesses and make available necessary documents and other evidence within the President's control.

b. The unit member and the College shall have the right to confront and cross-examine all adverse witnesses. When a witness cannot or will not appear, but the President of the College determines that the interests of fairness require admission of the witness' affidavit, the President of the College shall identify the witness, disclose the witness' affidavit, and give such statement appropriate probative weight in view of the parties' inability to cross-examine.

8. If the decision is for dismissal, the affected unit member may appeal to the Chancellor or Chancellor's designee within ten (10) days after receipt of the decision. The entire record so established, including the transcript, shall form the grievance record and shall be forwarded to the Chancellor or Chancellor's designee upon receipt of the Step One Appeal. Said appeal shall be construed as a grievance at Step Two of the Grievance Procedure, Article X, but the following expedited procedure shall apply:

a. The Chancellor or Chancellor's designee shall meet with the affected unit member for the purpose of conducting a hearing and shall render a written decision within fifteen (15) calendar days of receipt of the appeal.

b. Within fifteen (15) calendar days after receipt of the decision of the Chancellor or Chancellor's designee or within fifteen (15) days after it was due, the Association may initiate arbitration of a grievance involving dismissal of a unit member in accordance with the rules of the American Arbitration Association.

### 15.03 Discipline

Nothing in this Article shall preclude the Employer or its representatives from disciplining unit members by means less than discharge, including but not limited to suspension with or without pay, provided that such discipline shall be for just cause; and provided further that a unit member who is suspended without pay shall upon written request be entitled to a hearing within fourteen (14) calendar days after receipt of such request and to back pay in the event the suspension is reversed.

### 15.05
Unless otherwise specifically modified herein, the provisions of Article X shall be applicable to this Article. Discipline of a Unit Member pursuant to Article XIIIA shall be governed by the provisions of Article XIIIA and not Article XV.


### ARTICLE XXVI – Holdover

In the event that the Employer and the Association shall fail to secure a successor Agreement as hereinafter provided in Article XXVII prior to the termination of this Agreement, then this Agreement shall remain in full force and effect until a successor agreement is executed or an impasse in negotiations is reached.