UNITED STATES DISTRICT COURT FILED
DISTRICT OF MASSACHUSETTS CLERKS OFFICE

2005 FEB 10. A. NO. 04-CV-11658 RWZ

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | | |
|---|---|---|
| C. S. PANSÉ, *et al.*, | plaintiffs | } |
| | | } |
| v. | | } |
| | | } |
| L. NORMAN, *et al.*, | defendants | } |

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGEMENT

Index

|  | Page |
|---|---|
| Introduction | 1 |
| Facts | 2 |
| Arguments | |
| I.  This due process case is readily distinguished from due process cases cited herein | 7 |
| II.  Plaintiff was denied pre-deprivation Procedural Due Process | 9 |
| III.  Plaintiff was denied pre-deprivation Substantive Due Process | 12 |
| IV.  Plaintiff was effectively denied Post-deprivation Due Process | 13 |
| V.  The defendants violated plaintiff's Free Speech Rights | 15 |
| VI.  The Eleventh Amendment is no bar to § 1983 claims against state officials in their personal capacities | 17 |
| VII.  Congress has expressly distinguished judicial cures from arbitral remedies | 19 |
| VIII.  The *Haines* standard of *pro se* pleadings | 20 |
| IX.  This court should deny the defendants a license to abuse governmental power | 20 |
| Conclusion | 20 |

INTRODUCTION

This is an action to recover for injuries suffered due to dismissal of a tenured professor

from his protected employment, where the record and the underlined holdings of an Arbitrator demonstrate

underlined raw abuse of governmental power by defendants.

FACTS[1]

Numbers 1-20 below each correspond to the number in attached Affidavit of plaintiff.

1. The defendants were under a <u>Title VII written Federal warning</u> to refrain from intimidation of, and retaliation against, the plaintiff[2]; plaintiff, nonetheless, was subjected to dismissal from tenured professorship at Massachusetts Bay Community College ("MBCC") on August 2, 2002.

2. The defendant President of MBCC had told the plaintiff that MBCC was upset with the plaintiff's exercise of his protected activities and was going to watch the plaintiff specifically.

3. The charges against the plaintiff for the purposes of said dismissal amounted merely to the fact that during the Spring 2002 semester the plaintiff taught one research-type biotechnology ("biotech") rotation course[3] ("rotation") per long-standing practices of open laboratory and peer-mentoring methods,[4] as necessary for the research environment of the program.

4. The plaintiff has taught numerous other courses at MBCC, and has also been teaching in a biotechnology program at Boston University School of Medicine continuously since 1990.

5. MBCC did not state any charges whatsoever regarding any courses taught by the plaintiff other than the biotech rotation research course, or regarding any other matter whatsoever.

---

[1] The "Undisputed Facts" in the defendants' Memorandum are not undisputed, there having been no Local Rule 7.1 (A) (2) conference for discussion of the matter in this motion and counsel's Certificate of compliance with said Rule being <u>fraudulent</u>. Plaintiffs will file a separate Fed. R. Civ. Proc. 11(c) motion, pursuant to procedures set forth in said Rule, in that regard.

[2] plaintiff in the singular refers to the undersigned; other plaintiffs are his minor children.

[3] Cf Amended Complaint, ¶ 14.

[4] This meant that the lab was open from early in the morning till late at evening or night, as well as on weekends and during vacations, when students could, and did, spend extensive time in the lab, carrying out sophisticated projects, and experienced students helped newcomers in performing procedures (because one also learns by teaching). Cf Amended Complaint, n. 6. These methods are unique and are distinct from the routine non-research science courses with a laboratory component (such as a Bio 101 familiar to most with a college education).

6. At the beginning of a hearing[5] on July 29-30, 2002 pursuant to a Collective Bargaining Agreement ("CBA,"[6]), where the plaintiff could be dismissed only for just cause, the attorney for grievant/plaintiff objected that the hearing officer, Norman, recuse himself because Norman was a defendant in lawsuit brought by the grievant/plaintiff and pending at that time in the Superior Court[7], and as such, Norman was incompetent to judge the grievant fairly.

7. Undisputed evidence at said hearing established that said biotech rotations had been designed and taught as described herein by the plaintiff from the very inception of said courses in 1993.

8. Undisputed evidence at said hearing established that college officials had acknowledged under oath, during depositions in said action in the Superior Court, that they were aware of, and approved of, teaching methods as described by the plaintiff for the biotech rotations.

9. At said hearing, some defendants claimed under oath that they had told the plaintiff to change said teaching methods; plaintiff asserted under oath that no such request or directive ever existed.

10. There does not exist a single piece of evidentiary paper anywhere to substantiate claims by defendants that they told the plaintiff to change said teaching methods; accounts of meetings written by defendants themselves, where said meeting were called and conducted by defendants, demonstrate that no defendant ever told the plaintiff to change said teaching methods.

11. Plaintiff testified at said hearing that he would have undoubtedly changed said teaching procedures had he received any directive whatsoever to so change.

12. Plaintiff repeated said assertions at a CBA Article 15.02 (8) appeal hearing to the designee (Tsaffaras) of the Chancellor (Gill) of Higher Education for the Commonwealth.

---

[5]the outcome of said hearing having been pre-carved in stone. Amended Complaint, ¶ 26.

[6]Provisions of the CBA relevant for action herein are appended to Amended Complaint.

[7]*see* Amended Complaint, n. 1

13. Plaintiff routinely and till close to the end of his employment at MBCC expressed his concerns regarding the needs for improvements in standards of education at community colleges.

14. While arbitration pursuant to CBA Articles 15.02 (8) (b) and 10.06 was in progress, it became obvious to the Arbitrator that the employer had no case and the Arbitrator twice suggested to counsels for parties that they "settle".

15. The Arbitrator ruled[8] on November 9, 2004 that the <u>employer had no justification whatsoever to even impose any discipline on the plaintiff, much less discharge him</u>.[9] *See also* Defendants' Exhibit A to their Memorandum for summary of the Arbitrator's holdings.

16. The Office of the Att'y General for the Commonwealth conveyed its position on December 8, 2004 by e-mail to the plaintiff that the plaintiff should go back to his work "now".

17. Even after the extraordinary finding by the Arbitrator and said remarkable opinion of the Office of the A.G., the defendants continued their retaliation in spite of the written Federal warning, *supra*. On January 30, 2005, the Arbitrator issued an Order pursuant to CBA Article 10.06 (E) that "the Employer shall reinstate the grievant to his position and make him whole for lost benefits under the Agreement, including back pay, minus interim earnings and benefits." The defendants have yet to reinstate him as of this submission on February 14, 2005.

18. In August 2002, the plaintiff applied for unemployment benefits, and MBCC claimed that the plaintiff was dismissed for misconduct and therefore was not entitled to said benefits. A hearing officer for the defendant Division of Unemployment Assistance (DUA) ruled in May 2003 that plaintiff had committed no misconduct because the employer had never notified him to

---

[8]after 12 days of hearings involving examinations under oath of numerous witnesses and rebuttal witnesses by counsels on direct, cross, redirect, etc.

[9]Amended Complaint, ¶ 40.

change the teaching methods, and the plaintiff was therefore entitled to unemployment benefits. DUA, without any process whatsoever, denied the plaintiffs any benefits until December 2003, and never paid the plaintiffs all the benefits due, including benefits for the minor children of the plaintiff ($ 25 per child per week, or approximately $ 325 per month for the 3 children alone).

19. Whereas the Harvards, Stanfords, Yales, and Browns of this world get the very best of high school graduates, community colleges, legally required to accept all comers with a high school diploma or a GED, are generally at the other end of such student accomplishment spectrum.

20. A witness for plaintiff testified at the arbitration that she had worked as a cook (for almost a decade) after a B.A. in liberal arts, and although she had never set foot in a science laboratory before enrolling at MBCC, was admitted to the Ph.D. program in pathobiology (immunology) at Brown University only the basis of her education in MBCC biotech program (plus one evening course at another university); she credited the plaintiff for her unbelievable success. Another witness for the plaintiff, a dark-skinned immigrant with one year of college in a Third World country, who was one of the beneficiaries of the federal grant for minorities,[10] won the extremely competitive and  prestigious Goldwater Scholarship as an MBCC biotech student, transferred to Brandies to complete his baccalaureate, and is well on his way to a Ph.D. in molecular biology at Yale, similarly credited said Jackson-Pansé program[11] for his successes.  These students are but a tip of the proverbial iceberg of such success stories of said biotech program.[12]  (At trial, plaintiff will seek to present many such witnesses, each a different and compelling story.)

---

[10]Amended Complaint, ¶ ¶ 15, 19-20.

[11]Amended Complaint, ¶ ¶ 14, 16-17.

[12]In view of his business interests, viz., placating the losing party (Amended Complaint, n.11), the Arbitrator, in his written decision, minimized such extraordinary accomplishments to "the program has produced talented graduates who have gone on to academic success."

21. Given such extraordinary successes of said program, the plaintiff was reluctant to change his teaching methodologies and destroy a model program absent a directive from the employer to so destroy the excellence in education for the poor and needy, and tried to convince the defendants during the defendants' purported investigation to let said excellence in education continue to roll.

22. Plaintiff understands that since dismissal of the plaintiff, the defendants have been successful in destroying said excellence of the biotechnology program built up through extraordinary hard work, that very excellence which led the federal government to praise said program as a national model for contemporary education, thereby completing an absolute moral outrage which the Attorney General should have seen as his duty to prevent.

23. The defendants named herein in their personal capacities are all extremely highly educated and are experienced managers. Some (Tsaffaras, BBO # 557782, who heard the appeal, *supra*; Morris, Romney) are lawyers, one (Taylor) has a Master's degree in management, and the rest (Norman, Gastenveld, Darkazalli, Sabbagh, Gill Scibelli) hold doctorates. Some (e.g., Taylor) have extensive experience in negotiating the CBA. They all possess extensive administrative or management experience in higher education, or in the government plus the private sector, holding the highest or high positions, and at times demonstrating astounding accomplishments.[13] Furthermore, MBCC administrators have access to the Community College Counsel's Office for legal advice without additional expense to the Commonwealth, and the BHE and the Office of the Governor employ lawyers for said purposes.

---

[13]Some of these individuals hold other degrees as well. His Excellency Mr. Romney has a Harvard MBA to go with his Harvard J.D., while the Chair of BHE, Stephen Tocco, has an honorary doctorate. Further, Norman has been the DIRECTOR OF THE FEDERAL BUREAU OF MINES and VICE PRESIDENT of CHASE MANHATTAN BANK, Tocco has been CEO of the Massachusetts Port Authority and Secretary of Economic Affairs for this Commonwealth, while the Chair of MBCC's Trustees, Richard Forbes, is a lawyer.

<u>ARGUMENTS</u>

<u>I.  THIS DUE PROCESS CASE IS READILY DISTINGUISHED FROM DUE PROCESS
CASES CITED HEREIN</u>

Individuals bring to Federal Courts due process claims which <u>appear unwarranted</u>. For

example, in *Parratt* v. *Taylor*, 451 U.S. 527, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981), of the

oft-cited *Parratt-Hudson* doctrine, the court was concerned with a prisoner suing the state in a

federal court for the grand sum of 23 dollars and 50 cents (albeit in 1976 dollars) "because 28

U.S.C. 1343, the predicate for the jurisdiction of the United States District Court, contains no

minimum dollar limitation." *Id.* at 529.  In another landmark holding, establishing the terms of

pre-deprivation due process when an employee has a protected property interest in his

employment, *Cleveland Board of Education* v. *Loudermill*, 470 U.S. 532, 84 L. Ed. 2d 494, 105

S. Ct. 1487 (1985), where the court held that such process was not offered to the respondent, the

court did note that the dismissal was for not disclosing past criminal record on the application for

employment, and that the Ohio Civil Service Commission had upheld the dismissal in a post-

deprivation due process.[14]  In *Gilbert* v. *Homar*, 520 U.S. 924; 117 S. Ct. 1807; 138 L. Ed. 2d

120 (1997), and in *FDIC* v. *Mallen*, 486 U.S. 230, 108 S. Ct. 1780, 100 L. Ed. 2d 265 (1988), the

court held that no pre*suspension* due process was due at all because "*ex parte* finding of probable

cause" from independent and highly authoritative sources (arrest by state police on a felony drug

charge in *Homar*, grand jury indictment in *Mallen*) provided adequate assurances that the

employee's suspension was not arbitrary or baseless or unwarranted.  However, even with such

criminal charges pending, a pre*termination* hearing would be constitutionally mandated.  *Homar*,

---

[14]Upon remand, the school board was allowed to plead additional fact that pre-deprivation
due process was provided, and Loudermill's dismissal was affirmed. *Loudermill* v. *Cleveland
Board of Education*, 844 F.2d 304 (6th Cir., 1988).

520 U.S. at 934 (citation omitted).  In *O'Neill* v. *Baker*, 210 F.3d 41 (1st Cir., MA, 2000), where the plaintiff sued state officials in their personal capacities after an Arbitrator determined that the plaintiff's dismissal was for just cause, the court noted that the plaintiff's work habits conflicted with the state's statutory obligation to "start to investigate . . . report of a physically or emotionally injured child within two hours of initial contact and complete the investigation within 24 hours . . . ," and further, plaintiff failed to seek judicial review of the arbitration.[15]

Here, the plaintiff, a tenured professor, was dismissed during the course of an on-going debate about teaching methods in one course.  Facts 2-5.  No one ever told the plaintiff to change said teaching methods, yet the basis for termination was said teaching methods, where said methods were in use at the College for many years and with explicit consent of the College. Facts 7-8.  Obviously, an Arbitrator[16] held here that the defendants could not even impose any disciplinary action[17] on the plaintiff, much less a discharge.  The Arbitrator's findings demonstrates that the defendants had no reason whatsoever to terminate the plaintiff, and the defendants only engaged in gross abuse of governmental power, allegedly to further their retaliatory motives[18], the Federal Warning in writing, *supra*, notwithstanding.

Plaintiffs, therefore, wish to respectfully submit at the outset that the due process claims herein are not of the variety in the well-noted precedents, such as those cited herein.

_____

[15]The Supreme Court, naturally, has held repeatedly, in many of the above cases and elsewhere, that not every little slight becomes a Constitutional crisis.

[16]after presiding over 12 days of examinations of witnesses and rebuttal witnesses by attorneys for opposing sides

[17]i.e., not one sentence of reprimand in plaintiff's personnel folder, let alone one minute of suspension from employment.

[18]Amended Complaint, ¶ ¶ 26-27, 29, 37.

## II. THE COURT SHOULD DENY THE DEFENDANTS' MOTION HEREIN BECAUSE PLAINTIFF WAS DENIED PRE-DEPRIVATION PROCEDURAL DUE PROCESS

A tenured professor has a Fifth Amendment property interest in that employment, and it is protected by constitutional due process guarantees made applicable to the states by the Fourteenth Amendment. *Loudermill*, 470 U.S. at 538-39; *O'Neill*, 210 F.3d at 47, citing *Cronin v. Town of Amesbury*, 81 F.3d 257, 260 n.2 (1st Cir. 1996). Such an employee, who can be dismissed only for just cause, is entitled to the constitutional minimum of "some kind of hearing" and "some pre-termination opportunity to respond" prior to any deprivation of said protected interest. *Loudermill*, 470 U.S. at 542; *O'Neill*, 210 F.3d at 47. This opportunity of constitutional gravity is to be "an <u>initial check against mistaken decisions</u> -- essentially, a determination of whether there are <u>reasonable grounds</u> to believe that the <u>charges against the employee are true and support the proposed action</u>." (emphasis added) *Loudermill*, 470 U.S. at 542, *O'Neill*, 210 F.3d at 48. The pre-termination process need be "an opportunity for the employee to tell his side of the story." *Gilbert* v. *Homar*, 520 U.S. 924, 929 (1997) (explaining *Loudermill*); *O'Neill*, 210 F.3d at 48. "By requiring the government to follow appropriate procedures when its agents decide to deprive any person of life, liberty, or property, the Due Process Clause promotes <u>fairness in such decisions</u>." *Daniels* v. *Williams*, 474 U.S. 327, 331 (1986) (emphasis added, citations and internal quotations omitted). Further, due process is flexible and calls for such procedural protections as the particular situation demands. *Morrissey* v. *Brewer*, 408 U.S. 471, 481, 33 L. Ed. 2d 484, 92 S. Ct. 2593; *FDIC* v. *Mallen*, 486 U.S. 230, 240, 108 S. Ct. 1780, 100 L. Ed. 2d 265; *Schweiker* v. *McClure*, 456 U.S. 188, 200; 102 S. Ct. 1665; 72 L. Ed. 2d 1 (1982). ". . . the timing and nature of the required hearing "will depend on <u>appropriate accommodation of the competing interests involved</u>." " (emphasis added) *Logan* v. *Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982) (citations omitted).

Furthermore, the Court has repeatedly held that due process demands impartiality on the part of those who function in quasi-judicial capacities. *Schweiker*, 456 U.S. at 195. The Court

presumes that a hearing officer is unbiased, and entertains a rebuttal "by a showing of conflict of interest or some other specific reason for disqualification". *Id.* (The claimants in *McClure*, a class action, did not seek disqualification of the hearing officer. *Id.* at 196.)

What is left unsaid in above Rules, because it is so trivial, but what most obviously must be assumed, is that this "some pre-termination opportunity to respond" at "some kind of hearing" cannot be a show-trial, let alone a complete farce. The Supreme Court's requirement for the Constitutional opportunity to be heard, "an <u>initial check against mistaken decisions</u> -- essentially, a <u>determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action,</u>" necessarily requires that a hearing for said Constitutional opportunity cannot be conducted in bad faith, but rather must be a good-faith dialog where the employer must be prepared to change his decision to dismiss an employee when evidence so indicates. An opportunity carrying constitutional gravity is absolutely useless if a retaliation-driven employer is going to ignore a written federal warning and is determined not to withdraw baseless charges under any circumstances.

Here, where the grounds for dismissal from a tenured professorship were limited to the employer's concerns with some teaching methods, and the employer and the plaintiff had merely conducted some discussion regarding said teaching methods, Facts 9-11, the <u>Arbitrator held</u> that the defendants had given <u>no notice whatsoever to the plaintiff that the employer wanted a change in the plaintiff's teaching methods</u> prior to the pre-deprivation hearing on July 29-30, 2005.

Therefore, the pre-termination hearing was a complete sham. *See also*, p 8, *supra*.

Had there been any good faith whatsoever in said pre-deprivation due process accorded the plaintiff here, the employer would have accepted the plaintiff's testimony that the plaintiff would certainly change said teaching procedures in question given a directive (*see* Fact 5, *supra*); <u>OR</u> alternatively, the employer could simply have assigned to the plaintiff non-biotechnology courses regarding which the employer had expressed no concerns (and let the plaintiff file

grievances pursuant to the CBA for claims of loss of his seniority in the biotechnology field);
OR honored the Supreme Court's dictum, ". . . in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay" (emphasis added). *Loudermill*, 470 U.S. at 544. The employer here avoided all reasonable alternatives to retaliation, thereby turning the pre-deprivation hearing into a farce worthy of the worst of banana republics.[19]

The attorney for the grievant/plaintiff did challenge the propriety of Norman to serve as a hearing officer, since Norman was in litigation with the grievant, said litigation being in process at the time of the hearing for more than 3 years (and Norman faced a certain prospect of being deposed by the grievant.) Fact 6, p 3. No pre-deprivation due process, *per se*, could be accomplished under said circumstances.

The competing interest (per *Logan*) here involved a tenured professorship, and required a due process commensurate with such status. Accordingly, the CBA required a more elaborate procedure of further review. At appeal, defendant Chancellor of Higher Education or her designee (Tsaffaras) knew or should have known from the record of the hearing on July 29-30, 2002, as well as the arguments at the appeal itself, that there was absolutely no substance whatsoever to the college's charges and due process was completely bypassed. Fact 12.

---

[19]Furthermore, the defendants' bad faith has been on display through a purported investigation process. Thus, for a critical meeting scheduled for April 29, 2002, with defendants Gastenveld and Taylor, Gasstenveld refused to reschedule the meeting to allow the plaintiff to bring his union representation pursuant to the CBA. Cf. *O'Neill*, 210 F.3d at 45, where such a meeting was postponed two times "to permit O'Neill to have a union representative present." Although the CBA Article 15.02 (7)(a) required the College to "make available necessary documents . . . within the President's control", defendants argue that the plaintiff " . . . was not entitled to . . . production of documents, . . . under either the CBA or . . . ." The assertion that "(T)he defendants, nonetheless, did provide Pansé with many documents" is deliberately misleading, as the defendants withheld documents of substance and only provided alternate documents of little or no value. Several defendants lied under oath at the hearing on July 29-30, 2003; since Norman, as the hearing officer at said hearing was not sworn in himself, could not lie under oath there, but proceeded to lie under oath when subpoenaed at the arbitration. Amended Complaint, ¶ ¶ 29, 37.

Further, the plaintiffs were provided with no due process whatsoever, not even a notice let alone a hearing, by the defendant Division of Unemployment Assistance for non-payment of certain unemployment insurance benefits, and failure to pay in a timely manner what was paid.

Thus, the plaintiff was provided with no pre-deprivation due process.

## III. THE COURT SHOULD DENY THE DEFENDANTS' MOTION HEREIN BECAUSE PLAINTIFF WAS DENIED PRE-DEPRIVATION SUBSTANTIVE DUE PROCESS

"Due Process Clause, like its forebear in the Magna Carta, was intended to secure the individual from the arbitrary exercise of the powers of government." *Daniels* v. *Williams*, 474 U.S. 327, 331 (1986) (citations omitted). "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff* v. *McDonnell*, 418 U.S. 539, 558 (1974), citing *Dent* v. *West Virginia*, 129 U.S. 114, 123 (1889). "Due Process Clause was intended to prevent government officials from abusing power, or employing it as an instrument of oppression." *Collins* v. *Harker Heights*, 503 U.S. 115, 126, 117 L. Ed. 2d 261, 112 S. Ct. 1061 (1992) (internal quotations and citations omitted). "(B)y barring certain government actions regardless of the fairness of the procedures used to implement them," the substantive part of the due process clause "serves to prevent governmental power from being used for purposes of oppression." *Daniels* v. *Williams*, 474 U.S. at 331 (emphasis added, citations omitted). ". . . the Due Process Clause of the Fourteenth Amendment . . . contains a substantive component, sometimes referred to as substantive due process, which bars certain arbitrary government actions regardless of the fairness of the procedures used to implement them" (emphasis added, internal quotations and citations omitted). *Id.* at 337 (concurring opinion of Justice Stevens, explaining the majority's holding at 331).

Here, similarly, it makes no difference whatsoever as to what procedural due process the defendants purported to offer, for under the facts of this case, as determined by the Arbitrator, no action whatsoever against the plaintiff could be justified. No individual in good faith could possibly have reached the conclusions that these defendants reached, regardless of the fairness of

the procedures used to reach them.  Whatever governmental interest there was in destroying a model educational program and in stopping the advance of minorities in scientific fields, said objectives could not be accomplished without a Notice to the plaintiff to change his teaching methods and forgo seeking federal funds for the needy.

The defendants' actions herein, therefore, amounted to nothing but raw abuse of governmental power, designed to accomplish a predetermined moral outrage.[20]

## IV. THE COURT SHOULD DENY THE DEFENDANTS' MOTION HEREIN BECAUSE PLAINTIFF WAS EFFECTIVELY DENIED POST-DEPRIVATION DUE PROCESS

The Due Process Clause requires provision of a hearing "at a meaningful time." *Armstrong* v. *Manzo*, 380 U.S. 545, 552 (1965).  At some point, a delay in the post-termination hearing does become a constitutional violation.  *Barry* v. *Barchi*, 443 U.S. 55, 66, 99 S. Ct. 2642, 61 L. Ed. 2d 365 (1979).  Promptness, or lack thereof, in post-deprivation due process must be considered, *Homar*, 520 U.S. at 932, since "our opinions have recognized the severity of depriving someone of the means of his livelihood" (emphasis added), citing *Mallen*, 486 U.S. at 243, and *Loudermill*, 470 U.S. at 543, and such cases "have also emphasized that . . . account must be taken of the length . . . of the deprivation" (emphasis added), citing *Logan* v. *Zimmerman Brush Co.*, 455 U.S. 422, 434, 71 L. Ed. 2d 265, 102 S. Ct. 1148 (1982).  A 9 month long post-termination process was not unconstitutional in *Loudermill*, 470 U.S. at 547, where the grievant only claimed that it took too long without providing any reasons for the delay, and a few days without medical insurance was acceptable in *Homar*.  Further,

> . . . the employer shares the employee's interest in avoiding disruption and erroneous decisions; and until the matter is settled, the employer would continue to receive the benefit of the employee's labors. It is preferable to keep a qualified employee on than to train a new one. A governmental employer also has an interest in keeping citizens usefully employed rather than taking the possibly erroneous and counterproductive step of forcing its employees onto the welfare rolls.

*Cleveland Board of Education* v. *Loudermill*, 470 U.S. 532, 544 (1985).  As further described,

---

[20]Amended Complaint, ¶ 48.

partially only, by Justice Marshall,

> . . . Considerable amounts of time may pass between the termination of wages and the decision in a post-termination evidentiary hearing - . . . before . . . a decision from his postdeprivation hearing. During this period the employee is left in limbo, deprived of his livelihood and of wages on which he may well depend for basic sustenance. In that time, his ability to secure another job might be hindered, either because of the nature of the charges against him, or because of the prospect that he will return to his prior public employment if permitted. Similarly, his access to unemployment benefits might seriously be constrained, because many States deny unemployment compensation to workers discharged for cause. Absent an interim source of wages, the employee might be unable to meet his basic, fixed costs, such as food, rent or mortgage payments. He would be forced to spend his savings, if he had any, and to convert his possessions to cash . . . Even in that instance
>
> "[t]he substitution of a meager welfare grant for a regular paycheck may bring with it **painful and irremediable** personal as well as financial dislocations. . . . a person's **relationship with his friends and even his** *family may be irrevocably affected*. The costs of being forced, even temporarily, onto the welfare rolls because of a wrongful discharge from tenured Government employment **cannot be so easily discounted**," . . .
>
> Moreover, it is in no respect certain that a prompt postdeprivation hearing will make the employee economically whole again, and the **wrongfully discharged employee will almost inevitably suffer irreparable injury**. . . . the delay in receipt of wages would **thereby be transformed into a** *permanent deprivation*. Of perhaps equal concern, the **personal trauma** experienced during the long months in which the employee awaits decision, during which he **suffers doubt, humiliation**, and the loss of an opportunity to perform work, **will never be recompensed**, and indeed probably could not be with dollars alone.
>
> That these disruptions ... might fall upon a wrongfully discharged employee is simply unacceptable. ...
>
> Were there any guarantee that the postdeprivation hearing and ruling would occur promptly, such as within a few days of the termination of wages, then this minimal predeprivation process might suffice. ... if the employer had to pay the employee until the end of the proceeding, the employer obviously would have an incentive to resolve the issue expeditiously. The employer loses this incentive if the only suffering as a result of the delay is borne by the wage earner, who eagerly awaits the decision on his livelihood.

*Id.* at 549 (citations omitted, emphasis added) (concurring in part, concurring in the judgment).

Here, it has been 30½ months since deprivation, and defendants collectively have, not just

needlessly, but deliberately, dragged the post-deprivation process to unacceptable lengths.[21]
During this very long period, the defendants have had repeated indications, as if they needed any,
that plaintiff's dismissal was without any basis whatsoever, yet they persist in their retaliation.

During this period, the plaintiff, in his 50s, has had no medical or dental care at all. His
dependant minors have had no dental care, and only minimal care as required for certification for
participation in the local public schools. Plaintiffs have liberty interests in their health and
consortium, combined with property interests in their health, consortium, medical benefits as
well as in the plaintiff's salary and retirement investments (plaintiff not being part of the state's
retirement system.) Takings of these by the state without due process is an extremely egregious
matter. As pointed out by the Court, *supra*, these losses "will never be recompensed, and indeed
probably could not be with dollars alone," *Id.*, irrespective of how many dollars a jury awards.

## V. THE COURT SHOULD DENY THE DEFENDANTS' MOTION HEREIN BECAUSE THE DEFENDANTS VIOLATED THE PLAINTIFF'S FREE SPEECH RIGHTS

The First Amendment right to free speech of a public employee depends upon "a balance
between the interests of the [employee], as a citizen, in commenting upon matters of public
concern and the interest of the State, as an employer, in promoting the efficiency of the public
services it performs through its employees. *Pickering* v. *Board of Education*, 391 U.S. 563, 568
(1968). However, "The repeated emphasis in *Pickering* on the right of a public employee as a
citizen, in commenting upon matters of public concern, was not accidental." *Connick* v. *Myers*,
461 U.S. 138, 143, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983) (emphasis added, internal quotation
mark omitted). "This language" has been "reiterated in all of Pickering's progeny". *Id.* Such
emphasis on the rights to free speech of public employees is justified, because the "First
Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of
political and social changes desired by the people." (emphasis added, internal quotation mark

---

[21]Amended Complaint, ¶ ¶ 38-39, 41-43, n.10. Also, Fact 13, p 4, *supra*.

-16-

omitted). *Roth* v. *United States*, 354 U.S. 476, 484 (1957); *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 269 (1964). After all, "[Speech] concerning public affairs is more than self-expression; it is the essence of self-government." (internal quotation mark omitted). *Garrison* v. *Louisiana*, 379 U.S. 64, 74-75 (1964). "Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (emphasis added, internal quotation mark omitted). *Connick*, 461 U.S. at 145, citing *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982), and *Carey* v. *Brown*, 447 U.S. 455, 467 (1980). The question of whether the speech of the public employee is "of a kind that is of legitimate concern to the public" is answered by determining whether a common-law action for invasion of privacy is present. *Connick*, 461 U.S. at 143, n. 5. If an "action for invasion of privacy cannot be maintained", then "the subject matter of the publicity is matter of public record". *Id.*, citing *Cox Broadcasting Corp.* v. *Cohn*, 420 U.S. 469 (1975). Further, this First Amendment protection to a public employee's free speech also applies when the employee communicates privately with his employer, rather than expressing his views publicly. *Givhan* v. *Western Line Consolidated School District*, 439 U.S. 410 (1979).

Here, plaintiff's protected speech was continuous during the his employment, lasting almost till his dismissal, in the form of e-mails and memoranda to the employer, as well as comments in faculty meetings. The speech itself concerned improvements in the nature and level of education at community colleges, which are known for poor quality education.[22] If the quality of education at public institutions is not a matter of public concern, nothing ever will be. Unlike in *Connick*, plaintiff here had nothing to gain personally but the defendants' wrath, as plaintiff's position or salary would not be improved in the slightest in this union shop over those of his union brothers by engaging in said speech. Plaintiff's speech here was thus motivated only by an

---

[22]Amended Complaint, ¶ 18.

interest in improving public higher education and providing the taxpayers with their money's worth. Such speech could only result in the improvements of the status of the college and its students, and not cause any harm. Finally, no one could maintain a common law action in invasion of privacy by addressing the ways in which quality of education could be bettered.

While the plaintiff thus engaged only in protected speech and only for benefit of the public, the employer repeatedly expressed his displeasure at said activity, and despite complete lack of any justification to dismiss the plaintiff, accomplished retaliation through dismissal.

## VI.  THE COURT SHOULD DENY THE DEFENDANTS' MOTION HEREIN BECAUSE THE ELEVENTH AMENDMENT IS NO BAR TO § 1983 CLAIMS AGAINST STATE OFFICIALS IN THEIR PERSONAL CAPACITIES[23]

The Eleventh Amendment does <u>not</u> mean that a citizen, injured by a state,

"has no recourse: the Eleventh Amendment is not a bar to the naming of a state official, rather than the state or agency, as a defendant. A plaintiff may, subject to a number of caveats, obtain injunctive relief against state officials and also, if she <u>sues the officials in their individual capacities, recover monetary relief from them</u>." (emphasis added, internal citation omitted)

*O'Neill*, 210 F.3d at 47. Even "<u>punitive damages</u> . . . are available in a suit against an official <u>personally</u>" (emphasis added). *Kentucky* v. *Graham*, 473 U.S. 159, n. 13; 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985), citing *Smith* v. *Wade*, 461 U.S. 30 (1983). For the purposes of suing state officials in their personal capacities, it makes no difference that the state has chosen to indemnify such officials and any relief ordered by a federal court will be paid from the state's treasury. *Chestnut* v. *Lowell*, 305 F.3d 18 (1st Cir. 2002).

Here, plaintiffs assert violations of their rights under First, Fifth and Fourteenth Amendments by state officials in their individual capacities for asserting § 1983, and seek

---

[23]This exemption and a very long line of cases go back to the times of Chief Justice Marshall and *Osborne* v. *Bank of the United States*, 22 U.S. (9 Wheat.) 738 (1824), although *Ex parte Young*, 209 U.S. 123 (1908) gets the credit as "one of the three most important decisions the Supreme Court of the United States has ever handed down," *Allied Artists Pictures Corp.* v. *Rhodes*, 473 F. Supp. 560, 564 (E.D. Ohio 1979) (citations omitted).

damages for injuries suffered due to said violations. Defendants Norman, Gastenveld, Darkazalli, Sabbagh and Taylor violated due process rights of plaintiff by lying under oath in order to deprive the plaintiffs of their property rights and cause the plaintiffs multiple resultant injuries, and defendants Norman, Tsaffaras, Gill and Romney, Scibelli and Morris violated due process rights of plaintiff, deprived the plaintiffs of their property rights, and caused the plaintiffs multiple resultant injuries, by causing dismissal of plaintiff without cause and unduly delaying reinstatement. What have been colored by the defendants as "state law claims" in the Counts of the Amended Complaint are descriptions of resulting injuries and claims in common law terms for ease in understanding by the jury. Plaintiffs, therefore, state valid claims against officials of the state in the personal or individual capacities of said officials.[24]

The defendants try to hide under the "caveats" mentioned in *O'Neill*: qualified immunity because they acted "reasonably" and did "nothing" which could be a violation of plaintiff's constitutional rights. <u>Nothing could be further from the truth</u>. This is an extremely highly educated group with very impressive record of experience in administration and management for each. Fact 23, n12, p 6. Given their attention to detailed provisions of the 'due process' and 'just cause' causes in the CBA and insistence of constructing a complete facade, *supra*, they all understood it, and ignored it just as they ignored the need to be truthful under oath.

Further, a history class in most high schools in our country teaches one what the First Amendment is all about.

There are thousands upon thousands of officials in our country, far less educated and experienced than the defendants herein, who exhibit no difficulty understanding the

---

[24]Plaintiffs' claims against the state and its officials in their official capacities are limited to violations of rights under First, Fifth and Fourteenth Amendments; plaintiffs state no § 1983 claims against either the state or its officials in their official capacities, plaintiffs' § 1983 claims being limited to individual defendants in their personal capacities only. *See* headings of Counts in Amended Complaint. The A.G.'s arguments on pages 6-8 of the defendants' Memorandum in support of their Motion, therefore, amount to much ado about precisely nothing.

constitutional rights of their employees with property interests in the employment; holding the defendants herein to any less standard would result in gross miscarriage of justice.

The defendants are, therefore, liable in their personal capacities.

## VII. THE COURT SHOULD DENY THE DEFENDANTS' MOTION HEREIN BECAUSE CONGRESS HAS EXPRESSLY DISTINGUISHED JUDICIAL CURES FROM ARBITRAL REMEDIES

The U.S. Congress intended any cause of action pursuant to § 1983 to be judicially enforced. *McDonald* v. *City of West Branch*, 466 U.S. 284, 290 (1984). "Title VII contained an express private right of action, . . . and involved adjudication of the rights of an individual under the Constitution, an inquiry that, with all due respect to arbitration, has historically been the sole province of Article III adjudication." *Page* v. *Moseley, Hallgarten, Estabrook, and Weeden, Inc.*, 806 F.2d 291, 297 (1st Cir. 1986). Whereas an arbitrator's expertise "pertains primarily to the law of the shop, not the law of the land", *Alexander* v. *Gardner-Denver Co.*, 415 U.S. 36, 57 (1974), the very purpose of § 1983 is to provide judicial protection from any violation of the constitutional rights by individuals wielding state power, *Mitchum* v. *Foster*, 407 U.S. 225, 242 (1972). The arbitrator's authority is confined to resolution of questions of contractual rights, regardless of whether they resemble or duplicate Title VII rights. *Alexander*, 415 U.S. at 52. Further, the arbitration at union-shops is between the union and the employer, rather than between a grievant and the employer, and the interests of the individual and the union may not be compatible. *Barrentine* v. *Arkansas- Best Freight System, Inc.* 450 U.S. 728, 743 (1981). Thus, arbitration is well suited to disputes in contracts, and only a judicial proceeding can adequately protect the federal constitutional and statutory rights that § 1983 is intended to safeguard. *McDonald*, 466 U.S. at 290.

Thus, a § 1983 action in a court is entirely independent of any arbitration.

The arbitration herein is between a union and the employer. *See* caption, Exhibit A to Defendants' Memorandum. The plaintiffs herein do not become parties to this arbitration just

because the union arbitrates on behalf of one of the plaintiffs. Yet, the Attorney General for the Commonwealth, with no supporting rationale whatsoever, urges this Court to overturn a unanimous holding of the U.S. Supreme Court in *McDonald* and dismiss the plaintiffs' action, with prejudice no less, merely because the state is in arbitration with a union.

A more dilatory and frivolous argument may never have been submitted to this Court.

## VIII. THE *HAINES* STANDARD OF PRO SE PLEADINGS

Plaintiffs respectfully submit to this Court the standard for *pro se* pleadings as a matter of right: " . . . (T)he allegations of the pro se complaint, which we hold to less stringent standards . . . ." *Haines* v. *Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed. 2d 652 (1972). *See*, further, *O'Connor* v. *Yezukevicz*, 589 F.2d 16 (1st Cir., 1978) (where the Appeals Court struggled to determine which statute it was that the *pro se* temporary employee of the US Post Office might be suing under and what his claims could possibly be).

## IX. THIS COURT SHOULD DENY THE DEFENDANTS A LICENSE TO ABUSE POWER

"(W)e have long recognized that the choice of forums inevitably affects the scope of the substantive right to be vindicated." *Alexander*, 415 U.S. 56. Plaintiffs assert that this federal court is the forum best suited for federal remedies to stop the state's abuse of power as herein.

Plaintiffs will seek to further amend their Complaint, with no additional facts, but only an additional theory (Amended Complaint, ¶ 50) which will merely relate back to the same events as herein, Fed. R. Civ. Proc. 15 (c), for plaintiffs believe that this provided the easiest access to attorney fees and punitive damages. The statute of limitations for said theory (2 yrs.) having expired due to endless dragging by the defendants, allowing the defendants' Motion will only amount to providing a licence to government officials to continue to abuse power as herein.


## CONCLUSION

Defendant's Motion, for reasons above, is entirely without merit and should be denied.

Respectfully submitted, this 14th day of Feb. 2005,

Chandrakant S. Pansé, *pro se*
34 Frances St., Newton Highlands, MA 02461-1608
Tel. 617-527-9283 / 617-967-8430
E-mail DrCP@rcn.com