UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2006 NOV 13 P 3: 23

C. A. No. 04-CV-11658-RWZ

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | | |
|---|---|---|
| C. S. PANSÉ, *et al.*, | plaintiffs | } |
| | | } |
| v. | | } |
| | | } |
| L. NORMAN, *et al.*, | defendants | } |

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Index

| | Page |
|---|---|
| Introduction  .   .   .   .   .   .   .   .   .   .   . | 1 |
| Facts  .   .   .   .   .   .   .   .   .   .   .   . | 2 |
| Argument | |
|    Summary of Argument   .   .   .   .   .   .   .   . | 5 |
|    I.  Res judicata: facts established in state proceedings are to be accepted here | |
|         as established beyond review   .   .   .   .   .   . | 6 |
|    II.  Plaintiff was denied pre-deprivation Procedural Due Process   .   .   . | 8 |
|    III. Plaintiff was denied pre-deprivation Substantive Due Process   .   .   . | 10 |
|    IV. Plaintiff was effectively denied Post-deprivation Due Process   .   .   . | 12 |
|    V.  The defendants violated plaintiff's Free Speech Rights   .   .   .   . | 14 |
|    VII. Congress has expressly distinguished judicial cures from arbitral remedies   . | 16 |
| Conclusion   .   .   .   .   .   .   .   .   .   .   . | 17 |

INTRODUCTION

This is an action to recover for injuries suffered by the Plaintiffs where state proceedings established <u>raw abuse of governmental power</u> by the Defendants.

## FACTS[1]

1. The Defendants were under a Title VII written Federal warning to refrain from intimidation of, and retaliation against, the Plaintiff,[2] Exhibit A; the Plaintiff being included in this warning as a Co-Principle Investigator of the Federal grant in question, Affidavit, attached.

2. Plaintiff cooperated with the Federal investigation referred to in said warning, as well as another Federal audit in the same time period. *Id.*

3. Defendants admit that the Plaintiff had a Constitutionally protected property interest in his state employment. Defendant's Memorandum for this motion ("DM:") at 8.

4. The plaintiff taught numerous courses at MBCC, the teaching methods in only <u>one</u> of which were questioned in this entire saga; there were no issues whatsoever regarding any of the other courses taught by the Plaintiff, and there was no problem whatsoever in assigning, at least temporarily, those other courses for the Plaintiff to teach. Affidavit, attached.

5. <u>Undisputed</u> evidence established that said <u>one</u> course was designed and taught as a research course, establishing a long-held prior practice, and that college officials had acknowledged <u>under oath</u> that they approved of said practices. Defendants' Exhibit ("DEx:") H, at II:85-96, 100-101.

6. At said hearing, counsel for Plaintiff objected that the Hearing Officer, Defendant Norman, as a defendant in another pending state lawsuit by this Plaintiff, was incompetent to judge the Plaintiff. *Id.* at I:14-15. Norman pressed on as the hearing officer nonetheless. *Id.*

7. The employer was determined to terminate the Plaintiff prior to any hearing. Exhibit B.

8. Defendants admit that they deprived the Plaintiff of his Constitutionally protected property interest from 8-2-2002 to 10-19-2005, a minimum 1,150 days (or 39 months.) DEx: I, O.

---

[1] The Defendants, in their memorandum, continue to push disputed facts as undisputed.

[2] plaintiff in the singular refers to the undersigned; other plaintiffs are his children.

9. In reality, parts of this deprivation continued until late July 2006. Affidavit, attached.

10. Appeal to the Chancellor's designee Tsaffaras was relatively a brief, perfunctory affair. *Id.*

11. MBCC challenged the Plaintiff's claim for unemployment benefits on grounds that Plaintiff was fired for misconduct. *Id.* The Division of Unemployment Assistance of the state ruled on May 6, 2003, informing the state that the state's actions were wrongful.[3] *Id.*

12. The state refused an early date proposed by the Arbitrator for speedy hearing. *Id.* The state then stretched the arbitration process for as long as possible. *Id.*

13. During the employer's case in chief, the Arbitrator advised the parties on Apr. 17, 2003, and then again on Feb. 4, 2004, that charges against the Plaintiff were without substance, but the Defendants persisted in prolonging the arbitration process. *Id.*

14. MBCC Hearing Officer Norman, subpoenaed at the arbitration, testified that he mulled over the decision to fire the Plaintiff for "Oh, at least a couple of days;" however, evidence showed that he had lied under oath as he had conveyed his decision far sooner. Exhibit C, at 32-36.

15. Although the Plaintiff testified at the MBCC hearing that he would obviously follow any directive to alter his teaching methodology, DEx:H, II:123, said Hearing Officer Norman lied again under oath at arbitration, testifying that the Plaintiff indicated at MBCC that the Plaintiff would not follow procedures and that this was a "blatant and gross insubordination situation." Exhibit D, at 67.

16. The Arbitrator held that no discipline could be imposed on Plaintiff, let alone discharge, as employer's charges were unsupported by normal evaluation procedures. Exhibit E.

17. Employer's appeal in state court from the Arbitrator's holdings was rejected. DEx:N.

---

[3] Plaintiffs believe that Mass. G.L.c. 151A § 46(a) prohibits introduction of relevant documents in this action unless said Division is a party to this action.

18. The Office of the Att'y General for the Commonwealth opined on 12-8-2004 that Plaintiff go back to his work "now;" Plaintiff was not reinstated for 10 more months. Affidavit, attached.

19. Plaintiff routinely and always expressed his concerns regarding the needs for improvements in standards of education at community colleges, including, but not limited to, the need for the state to stop deceiving the students and taxpayers regarding the level and utility of community college education.[4] *Id.* This led to discussions at departmental faculty meetings at MBCC to start new courses with better standards. *Id.*

20. Illegal retaliation against faculty is an old hat for the employer herein. Exhibit F.

21. At a conference on July 12, 2006, the counsel for the Defendants continued his old practice of deliberately misleading this Court, lying that the Plaintiff's family medical insurance had been reinstated where no such reinstatement occurred until weeks later. Affidavit, attached.

22. The defendants named herein are all extremely highly educated and experienced officials. Some (Tsaffaras, who heard the appeal from MBCC hearing officer's decision, DM:4; Morris; Romney) are lawyers, one has a Master's degree in management, the rest all hold doctorates. Some have extensive experience in negotiating the CBA. All possess extensive administrative or management experience, holding the highest or high positions.[5] Further, all have ready access to ample legal advise from lawyers in permanent full time employ of the state. *Id.*

23. Each MBCC administrator lied under oath to the detriment of the Plaintiffs. *Id.*

---

[4]For a *recent* elucidation of such old concerns for recently hired new administrators at MBCC, *see*, Exhibit F.

[5]Chair of BHE, Tocco, was CEO of the state Port Authority and the state's Secretary of Economic Affairs, and is now Chair of the Board of Trustees at University of Massachusetts after the Governor's celebrated insistence to push him; Norman was a Presidential appointee as the Director of the Federal Bureau of Mines, then a Vice President of Chase Manhattan Bank, and President of a steel corporation; the Chair of MBCC's Trustees at the times of events herein, Richard Forbes, is a lawyer.

## ARGUMENT

SUMMARY OF ARGUMENT

Plaintiff had a protected property interest in his employment, and the Defendants acted under the color of state law. Defendants were under a written Federal warning to not intimidate or retaliate; Plaintiff then cooperated with two Federal probes of the employer. An Arbitrator held that the Defendants' charges and actions against the Plaintiff were so unsupported by usual evaluation processes that not even any minor discipline could be imposed on the Plaintiff, let alone his termination. The state Superior Court upheld the Arbitrator's finding that the actions against the Plaintiff appeared to be retaliation for litigation then pending.

Evidence demonstrates that the Hearing Officer was incompetent to conduct a hearing, that the Defendants had made up their minds to deprive the Plaintiff of his protected rights prior to any pre-deprivation hearing, and that the Defendants lied under oath during and regarding the hearing required by procedural due process.

A reasonable jury will be very impressed by the superb qualifications, experiences and accomplishments of the Defendants, and will concur with the Arbitrator and a state judge that the Defendants knew exactly what they were doing: retaliate; breaking laws in the process. There was no mere error or a random act by very high ranking officials with lots of legal assistance.

Therefore, a reasonable jury will see that the pre-deprivation hearing was no more than the Defendants going through motions to reach a predetermined retaliation.

A reasonable jury will also see that substantial due process required that the Defendants could not have carried out their action no matter what procedural due process was implemented.

A reasonable jury will also conclude that the Plaintiff must be compensated for retaliation where he struggled to improve the quality of community college education.

I. RES JUDICATA: FACTS ESTABLISHED IN STATE PROCEEDINGS ARE TO BE ACCEPTED HERE AS ESTABLISHED BEYOND REVIEW

Congress intended to preclude lower federal courts from reviewing state judgments (this being a negative inference of 28 U.S.C. § 1257, which provides for review of state court judgments only by the U.S. Supreme Court.) *Federación De Maestros De Puerto Rico* v. *Junta De Relaciones Del Trabajo De Puerto Rico*, 410 F.3d 17, 21 (1st Cir. 2005), citing *D.C. Court of Appeals* v. *Feldman*, 460 U.S. 462, 482 (1983) ("[A] US District Court has no authority to review final judgments of a state court in judicial proceedings.")

In the case at bar, since the employer did not appeal the state Superior Court decision, DEx:N, the state judgement is final. *Federación*, 410 F.3d at 21.

Further, a Massachusetts Court may not evaluate an arbitrator's findings or holdings, in either law or fact, but must accept them as binding, even if they appear erroneous, inconsistent, or unsupported by the record at the arbitration hearing, except for allegations of an arbitrator exceeding her/his authority, undue means -fraud, corruption, evidence of bias- or grounds of public policy. *Board of Higher Education* v. *Mass. Teachers Association*, 62 Mass. App. Ct. 42 (2004), citing *Lynn* v. *Thompson*, 435 Mass. 54, 61 (2001), cert. denied, 534 U.S. 1131 (2002), and *Higher Educ. Coordinating Council*[6] v. *Mass. Teachers' Assn./Mass. Community College Council*, 423 Mass. 23, 27 (1996).

Wherefor, in the case at bar, binding are not only the holdings in *Board of Higher Education* v. *Mass. Teachers Assn.*, Suffolk C.A. No. 05-0696-H, DEx:N, but also, exactly as holdings binding on state courts, all decisions of the Arbitrator which were not specifically on

---

[6]same entity as the Board of Higher Education before a name change; employer herein.

appeal in said state superior court adjudication.[7]

Wherefore, this Court should accept the following as <u>established, non-reviewable facts</u>:

A. Termination of the Plaintiff's state employment appeared driven by retaliation against the Plaintiff, a result of then pending state lawsuits. *See*, Memorandum of Decision and Order, MacDonald, J., Defendant's Exhibit N, at 1, 3.

B. The Defendants terminated the Plaintiff's Constitutionally protected employment where not even any discipline could be imposed. Fact 15, *supra*; Exhibit E. This, in spite of the written Federal warning to not intimidate or retaliate for a Federal investigation. Exhibit A.

C. A state judge had ruled in litigation underway at the time of employer terminating the Plaintiff in 2002 that the Plaintiff had stated a First Amendment cause of action. *Pansé v. Van Winkle et al.*, NOCV 99-287 (Norfolk Superior Court.) *See*, Affidavit, attached.

Taken together, these necessarily mean, *per se*, that there was no substance whatsoever in the actions leading to the deprivation of Plaintiff's protected rights, and illegal retaliation against the Plaintiff, resulting from a then pending lawsuit on First Amendment rights and cooperation with Federal probes (said investigation; Federal audit, Fact 2, *supra*) could be the only reason behind deprivation of the Plaintiffs' Constitutional rights.

Further, it would be only proper for a Federal trial judge to so instruct a jury that the state holdings of retaliation and no reason whatsoever to take any action whatsoever against the Plaintiff are binding, and let the jury factor in the written Federal warning.

---

[7] However, no preclusion can be applied to any of the Plaintiffs' pleadings or claims, as the Plaintiff was not a party to either said Arbitration or the Suffolk Superior adjudication; rather, the employer and the faculty union (Massachusetts Community College Council, affiliated with the Massachusetts Teachers Association) were the parties to said proceedings as evident from the Defendants' exhibits.

## II. THE COURT SHOULD DENY THE DEFENDANTS' MOTION HEREIN BECAUSE PLAINTIFF WAS DENIED PRE-DEPRIVATION PROCEDURAL DUE PROCESS

Defendants admit that the Plaintiff, enjoying Constitutional protections, could be dismissed only for just cause. DM:8. Wherefor, the Plaintiff was entitled to the constitutional minimum of a hearing and pre-termination opportunity to respond. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542 (1985); *O'Neill v. Baker*, 210 F.3d 41, 47 (1st Cir., MA, 2000). This opportunity of constitutional gravity is for "an initial check against mistaken decisions - essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." (emphasis added) *Loudermill*, 470 U.S. at 542, *O'Neill*, 210 F.3d at 48. The pre-termination process must be "an opportunity for the employee to tell his side of the story." *Gilbert v. Homar*, 520 U.S. 924, 929 (1997) (explaining *Loudermill*); *O'Neill*, 210 F.3d at 48. The due process requirement, that the government follow appropriate procedures when depriving any person of life, liberty, or property, promotes fairness in such decisions. *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (citations omitted).

Furthermore, the Court has repeatedly held that due process demands impartiality on the part of those who function in quasi-judicial capacities. *Schweiker v. McClure*, 456 U.S. 188, 195 (1982), and citations therein. The Court presumes that a hearing officer is unbiased, and entertains a rebuttal "by a showing of conflict of interest or some other specific reason for disqualification". *Id.*

What is most obvious from these holdings is that this pre-termination opportunity to respond must be before an unbiased hearing officer and must be at a genuine hearing. A fair hearing must be conducted to ensure that charges against the employee can be supported by any evidence and that there is no mistaken termination.

Most importantly, there must be a good-faith dialog where the employer must be prepared

-8-

to change his decision to dismiss when evidence so indicates. An opportunity carrying constitutional gravity is absolutely useless in absence of an honest determination.

Here, evidence demonstrates that the employer was determined to terminate the Plaintiff prior to any hearing. A reasonable jury can certainly conclude that the Hearing Officer Norman repeatedly declared so in writing. Exhibit B ("*we* have determined" that two tenured professors, "one a black and the other Indian", had failed in their duties, the College was "taking action to terminate" them, i.e., MBCC was going through the motions necessary to fire tenured professors, "Professor Panse has been officially served with his dismissal notice," not that the college will decide after a hearing) (emphasis added;) the Chancellor or the Defendant Boards did not stop any of this.

Further, the hearing at MBCC resulted in absolute deprivation, almost immediately upon the completion of said hearing. DEx:I. Appeal from this total deprivation to the Chancellor's designee Tsaffaras was relatively a brief, perfunctory affair with no reporter present and no notes taken by anyone during said encounter. Fact 10, *supra*.

A reasonable jury should conclude from the facts established, *supra*, that the Defendants' actions herein were nothing but pure illegal retaliation, and that Hearing Officer Norman lied under oath to cover up his intentions and actions. Facts 14, 15, *supra*.

Therefore, a reasonable jury will conclude that the pre-termination hearing was an absolute sham by an incompetent (Fact 6, *supra*) hearing officer, and that there was no true pre-termination hearing and no true pre-deprivation due process.

A reasonable jury will believe in the Plaintiff's obvious declaration at the MBCC hearing that he would follow the employer's (non-illegal) policies and procedures (Fact 15, *supra*) and a reasonable jury will therefore concur with the Arbitrator that there existed no grounds whatsoever to deprive the Plaintiffs of their Constitutionally protected rights.

A reasonable jury will also concur with the Plaintiff that had there been any good faith whatsoever in said pre-deprivation due process allegedly accorded the Plaintiff, the employer could and would have simply assigned to the plaintiff courses regarding which the employer had

no concerns; OR honored the Supreme Court's directive, ". . . in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay" (emphasis added), *Loudermill*, 470 U.S. at 544.

Even when the Supreme Court language is technically dictum, such unambiguous directives from the Supreme Court cannot be ignored when the Court issues clear instructions on how to address certain situations. *Todd v. Weltman, Weinberg & Reis, Co.*, 434 F.3d 432, 437 (6th Cir. 2006) (cited by the 1st Cir. Appeals Court in *Galibois v. Fisher*, No. 05-1576, unpublished.) Plaintiffs will seek jury instruction as to this law.

Any reasonable jury will see that the employer here simply avoided all reasonable alternatives to retaliation, above directives from the U.S. Supreme Court notwithstanding.[8]

## III. THE COURT SHOULD DENY THE DEFENDANTS' MOTION HEREIN BECAUSE PLAINTIFF WAS DENIED PRE-DEPRIVATION SUBSTANTIVE DUE PROCESS

"Due Process Clause, like its forebear in the Magna Carta, was intended to secure the individual from the arbitrary exercise of the powers of government." *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (citations omitted). "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974), citing *Dent v. West Virginia*, 129 U.S. 114, 123 (1889). "Due Process Clause was intended to prevent government officials from abusing power, or employing it as an instrument of oppression." *Collins v. Harker Heights*, 503 U.S. 115, 126 (1992) (internal quotations and citations omitted). "(B)y barring certain government actions regardless of the fairness of the

---

[8]Furthermore, the defendants' bad faith has been on display through a purported investigation process. Thus, for a critical meeting scheduled for April 29, 2002, with defendants Gasteneveld and Taylor, Gasstenveld refused to reschedule the meeting to allow the plaintiff to bring his union representation pursuant to the CBA. Cf. *O'Neill*, 210 F.3d at 45, where such a meeting was postponed two times "to permit O'Neill to have a union representative present." Further, the Defendants refused to "make available necessary documents . . . within the President's control" pursuant to the CBA Article 15.02 (7)(a).

procedures used to implement them," the substantive part of the due process clause "serves to prevent governmental power from being used for purposes of oppression." *Daniels* v. *Williams*, 474 U.S. at 331 (emphasis added, citations omitted). ". . . the Due Process Clause of the Fourteenth Amendment . . . contains a substantive component, sometimes referred to as substantive due process, which bars certain arbitrary government actions <u>regardless of the fairness of the procedures</u> used to implement them" (emphasis added, internal quotations and citations omitted). *Id.* at 337 (concurring opinion of Justice Stevens, explaining the majority's holding at 331).

Here, even if *arguendo* the Plaintiffs were offered any pre-deprivation procedural due process, as a matter of law, that procedural due process makes no difference whatsoever, for, regardless of the fairness of the procedures used to implement the Defendant's decisions, those actions were barred as entirely unjustified as determined by the Arbitrator, and therefore as amounting to nothing but governmental oppression.

A reasonable jury will concur with the Arbitrator's holding that irrespective of any procedural due process the Defendants purported to offer, any action whatsoever against the Plaintiff amounted to violation of substantive due process rights, for no individual in good faith could possibly have reached the conclusions that these defendants reached, <u>regardless of the fairness of the procedures</u> used to reach them.

A reasonable jury, on the facts herein, will also conclude that the Defendants herein were highly educated and extremely highly experience officials, with all the legal assistance they could ever desire from full-time counsel on the state's payroll, and therefore what transpired here was no random act of one individual or an error of an unknowing official.

## IV. THE COURT SHOULD DENY THE DEFENDANTS' MOTION HEREIN BECAUSE PLAINTIFF WAS EFFECTIVELY DENIED POST-DEPRIVATION DUE PROCESS

The Due Process Clause requires provision of a hearing "at a meaningful time." *Armstrong* v. *Manzo*, 380 U.S. 545, 552 (1965). At some point, a <u>delay in the post-termination hearing does become a constitutional violation</u>. *Barry* v. *Barchi*, 443 U.S. 55, 66, 99 S. Ct. 2642, 61 L. Ed. 2d 365 (1979). Promptness, or lack thereof, in post-deprivation due process must be considered, *Homar*, 520 U.S. at 932, since "<u>our opinions have recognized the severity of depriving someone of the means of his livelihood</u>" (emphasis added), citing *Mallen*, 486 U.S. at 243, and *Loudermill*, 470 U.S. at 543, and such cases "have also emphasized that . . . <u>account must be taken of the length . . . of the deprivation</u>" (emphasis added), citing *Logan* v. *Zimmerman Brush Co.*, 455 U.S. 422, 434, 71 L. Ed. 2d 265, 102 S. Ct. 1148 (1982). A 9 month long post-termination process was not unconstitutional in *Loudermill*, 470 U.S. at 547, where the grievant only claimed that it took too long without providing any reasons for the delay, and a few days without medical insurance was acceptable in *Homar*. Further,

> . . . the employer shares the employee's interest in avoiding disruption and erroneous decisions; and until the matter is settled, the employer would continue to receive the benefit of the employee's labors. It is preferable to keep a qualified employee on than to train a new one. A governmental employer also has an interest in keeping citizens usefully employed rather than taking the possibly erroneous and counterproductive step of forcing its employees onto the welfare rolls.

*Cleveland Board of Education* v. *Loudermill*, 470 U.S. 532, 544 (1985). As further described, partially only, by Justice Marshall,

> . . . Considerable amounts of time may pass between the termination of wages and the decision in a post-termination evidentiary hearing - . . . before . . . a decision from his postdeprivation hearing. During this period the employee is left in limbo, deprived of his livelihood and of wages on which he may well depend for basic sustenance. In that time, his ability to secure another job might be hindered, either because of the nature of the charges against him, or because of the prospect that he will return to his prior public employment if permitted. Similarly, his access to unemployment benefits might seriously be constrained, because many States deny unemployment compensation to workers discharged for cause. Absent an interim source of wages, the employee might be unable to meet his basic, fixed costs, such as food, rent or mortgage payments. He would be forced to spend his savings, if he had any, and to convert his possessions to cash . . . Even

in that instance

> "[t]he substitution of a meager welfare grant for a regular paycheck may bring with it **painful and irremediable** personal as well as financial dislocations. . . . a person's **relationship with his friends and even his *family may be irrevocably affected***. The costs of being forced, even temporarily, onto the welfare rolls because of a wrongful discharge from tenured Government employment **cannot be so easily discounted**," . . .
>
> Moreover, it is in no respect certain that a prompt postdeprivation hearing will make the employee economically whole again, and the **wrongfully discharged employee will almost inevitably suffer irreparable injury**. . . . the delay in receipt of wages would **thereby be transformed into a *permanent deprivation***. Of perhaps equal concern, the **personal trauma** experienced during the long months in which the employee awaits decision, during which he **suffers doubt, humiliation**, and the loss of an opportunity to perform work, **will never be recompensed**, and indeed probably could not be with dollars alone.
>
> That these disruptions ... might fall upon a wrongfully discharged employee is simply unacceptable. ...
>
> Were there any guarantee that the postdeprivation hearing and ruling would occur promptly, such as within a few days of the termination of wages, then this minimal predeprivation process might suffice. ... if the employer had to pay the employee until the end of the proceeding, the employer obviously would have an incentive to resolve the issue expeditiously. The employer loses this incentive if the only suffering as a result of the delay is borne by the wage earner, who eagerly awaits the decision on his livelihood.

*Id.* at 549 (citations omitted, emphasis added) (concurring in part, concurring in the judgment).

Here, it was over 39 months of deprivation, and over 50 months of deprivation as to the medical insurance benefits, and defendants collectively have, not just needlessly, but deliberately, dragged the post-deprivation process to unacceptable lengths. Fact 12, *supra*. During this very long period, the defendants have had repeated indications, as if they needed any, that plaintiff's dismissal was without any basis whatsoever, yet they persist in their retaliation.

During this period, the plaintiff, in his 50s, has had no medical or dental care at all. His dependant minors have had no dental care, and only minimal care as required for certification for participation in the local public schools. Plaintiffs have liberty interests in their health and consortium, combined with property interests in their health, consortium, medical benefits as well as in the plaintiff's salary and retirement investments (plaintiff not being part of the state's

retirement system.)

Any reasonable jury will see that the state takings of the above interests is an extremely egregious matter. As pointed out by the Court, *supra*, these losses "will never be recompensed, and indeed probably could not be with dollars alone," *Id.*, irrespective of how many dollars a jury awards.

## V. THE COURT SHOULD DENY THE DEFENDANTS' MOTION HEREIN BECAUSE THE DEFENDANTS VIOLATED THE PLAINTIFF'S FREE SPEECH RIGHTS

The First Amendment right to free speech of a public employee depends upon "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. *Pickering* v. *Board of Education*, 391 U.S. 563, 568 (1968). However, "The repeated emphasis in *Pickering* on the right of a public employee as a citizen, in commenting upon matters of public concern, was not accidental." *Connick* v. *Myers*, 461 U.S. 138, 143, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983) (emphasis added, internal quotation mark omitted). "This language" has been "reiterated in all of Pickering's progeny". *Id.* Such emphasis on the rights to free speech of public employees is justified, because the "First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." (emphasis added, internal quotation mark omitted). *Roth* v. *United States*, 354 U.S. 476, 484 (1957); *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 269 (1964). After all, "[Speech] concerning public affairs is more than self-expression; it is the essence of self-government." (internal quotation mark omitted). *Garrison* v. *Louisiana*, 379 U.S. 64, 74-75 (1964). "Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (emphasis added, internal quotation mark omitted). *Connick*, 461 U.S. at 145, citing *NAACP* v. *Claiborne Hardware Co.*, 458 U.S.

886, 913 (1982), and *Carey* v. *Brown*, 447 U.S. 455, 467 (1980). The question of whether the speech of the public employee is "of a kind that is of legitimate concern to the public" is answered by determining whether a common-law action for invasion of privacy is present. *Connick*, 461 U.S. at 143, n. 5. If an "action for invasion of privacy cannot be maintained", then "the subject matter of the publicity is matter of public record". *Id.*, citing *Cox Broadcasting Corp.* v. *Cohn*, 420 U.S. 469 (1975). Further, this First Amendment protection to a public employee's free speech also applies when the employee communicates privately with his employer, rather than expressing his views publicly. *Givhan* v. *Western Line Consolidated School District*, 439 U.S. 410 (1979).

Here, a state adjudication in litigation pending when the Plaintiff was terminated, that the Plaintiff had stated a cause of action of retaliation in violation of the First Amendment rights, p. 7, *supra*, must be accepted as is.

Any jury will also agree with evidence that plaintiff's protected speech was continuous during the his employment, lasting almost till his dismissal, in the form of e-mails and memoranda to the employer, as well as comments in faculty meetings. The speech itself concerned improvements in the nature and level of education at community colleges. If the quality of education at public institutions is not a matter of public concern, nothing ever will be. Unlike in *Connick*, plaintiff here had nothing to gain personally but the defendants' wrath, as plaintiff's position or salary would not be improved in the slightest in this union shop over those of his union brothers by engaging in said speech. Plaintiff's speech here was thus motivated only by an interest in improving public higher education and providing the taxpayers with their money's worth. Such speech could only result in the improvements of the status of the college and its students, and not cause any harm. Finally, no one could maintain a common law action in invasion of privacy by addressing the ways in which quality of education could be bettered.

Finally, any jury will also see that the retaliation herein was carried out by highly educated and extremely knowledgeable officials with assistance from counsel in state employ.

## VI. THE COURT SHOULD DENY THE DEFENDANTS' MOTION HEREIN BECAUSE CONGRESS HAS EXPRESSLY DISTINGUISHED JUDICIAL CURES FROM ARBITRAL REMEDIES

The U.S. Congress intended any cause of action pursuant to § 1983 to be judicially enforced. *McDonald* v. *City of West Branch*, 466 U.S. 284, 290 (1984). "Title VII contained an express private right of action, . . . and involved adjudication of the rights of an individual under the Constitution, an inquiry that, with all due respect to arbitration, has historically been the sole province of Article III adjudication." *Page* v. *Moseley, Hallgarten, Estabrook, and Weeden, Inc.*, 806 F.2d 291, 297 (1st Cir. 1986). Whereas an arbitrator's expertise "pertains primarily to the law of the shop, not the law of the land", *Alexander* v. *Gardner-Denver Co.*, 415 U.S. 36, 57 (1974), the very purpose of § 1983 is to provide judicial protection from any violation of the constitutional rights by individuals wielding state power, *Mitchum* v. *Foster*, 407 U.S. 225, 242 (1972). The arbitrator's authority is confined to resolution of questions of contractual rights, regardless of whether they resemble or duplicate Title VII rights. *Alexander*, 415 U.S. at 52. Further, the arbitration at union-shops is between the union and the employer, rather than between a grievant and the employer, and the interests of the individual and the union may not be compatible. *Barrentine* v. *Arkansas- Best Freight System, Inc.* 450 U.S. 728, 743 (1981). Thus, arbitration is well suited to disputes in contracts, and only a judicial proceeding can adequately protect the federal constitutional and statutory rights that § 1983 is intended to safeguard. *McDonald*, 466 U.S. at 290.

Thus, a § 1983 action in a court is entirely independent of any arbitration.

The arbitration herein is between a union and the employer. *See* caption, Exhibit A to Defendants' Memorandum. The plaintiffs herein do not become parties to this arbitration just because the union arbitrates on behalf of one of the plaintiffs. Yet, the Attorney General for the Commonwealth, with no supporting rationale whatsoever, urges this Court to overturn a unanimous holding of the U.S. Supreme Court in *McDonald* and dismiss the plaintiffs' action.

## CONCLUSION

Wherefore, there exist several genuine issues of material fact to say the least, the reality as a matter of law being the Defendants knowingly and deliberately having violated the Plaintiffs' rights and having meticulously avoided U.S. Supreme Court guidelines to stay away from retaliation or extremely grievous mistakes. Therefore, the Defendant's motion is entirely without merit and should be denied.

Respectfully submitted,

Chandrakant S. Pansé
34 Frances St.
Newton Highlands, MA 02461-1608
Tel. 617-527-9283 / 617-967-8430
E-mail DrCP@rcn.com