

UNITED STATES DEPARTMENT OF EDUCATION
BOSTON OFFICE
JOHN W. McCORMACK POST OFFICE AND COURTHOUSE, ROOM 222
POST OFFICE SQUARE
BOSTON, MASSACHUSETTS 02109

AUG 0 8 2001

OFFICE FOR
CIVIL RIGHTS

Dr. Lindsay Norman, President
Massachusetts Bay Community College
50 Oakland Street
Wellesley Hills, Massachusetts 02481

Re: Complaint No. 01-01-2036

Dear Dr. Norman:

On May 21, 2001, the Office for Civil Rights (OCR) received a complaint filed by Dr. Bruce Jackson (Complainant) against the Massachusetts Bay Community College (College) alleging discrimination based on race. Specifically, the Complainant alleged that the College discriminated against minority students on the basis of their race by failing to timely process the documents necessary for the students to secure internship awards. The College is alleged to have changed the criteria for the awarding of internships and that the changes were based on race. OCR was advised that the College's discriminatory actions may be in retaliation for the Complainant's prior complaint with OCR.

OCR accepted this complaint for investigation and resolution because it contains allegations that fall within our jurisdiction under Title VI of the Civil Rights Act of 1964 and its implementing regulations (Title VI), which prohibit discrimination based on race. The College is subject to the requirements of Title VI because it receives Federal financial assistance from the U.S. Department of Education.

To assist us in the investigation and resolution of the complaint, please provide responses to the enclosed data request within fifteen (15) calendar days of the date of this letter. The College's legal obligation to provide the information requested is found at 34 C.F.R §§ 100.6(b) and (c) and 100.7(c). OCR's primary objective in complaint resolution is to resolve the Complainant's allegations of discrimination promptly and appropriately. OCR has a variety of tools for resolving complaints. These include early complaint resolution, agreements for corrective action, and enforcement. Any approach, or combination of approaches, may be initiated at any time and multiple approaches may be used to resolve any complaint. If this matter is not resolved and OCR proceeds with the investigation, it is likely that we will need to request additional information, interview College staff, and visit the College.

Furthermore, the implementing regulations of Title VI expressly prohibit retaliation and intimidation against persons who file complaints or exercise rights protected under the statute. This prohibition against retaliation and intimidation applies not only to recipients

Page 2 – Dr. Lindsay Norman, Complaint No. 01-01-2036

such as the College, but as the regulation reads, to "other persons" as well. Therefore, it is incumbent on the College to take appropriate steps to prevent any hostile, intimidating or threatening actions against the Complainant, students, or any other staff person who have or may seek to exercise their rights or, cooperate in the investigation of this or the prior complaint.

As we proceed with our investigation of this complaint, other members of our Complaint Team may contact you. If you have any questions, please contact Mr. Paul Cardoza, Equal Opportunity Specialist, at (617) 223-4144 (voice), 617-223-9669 (facsimile) or by electronic mail at Paul.Cardoza@ed.gov. You may also contact me directly at 617-223-9701. Thank you in advance for your cooperation.

Sincerely,

Donna L. Russell
Team Leader/Civil Rights Attorney

Enclosure/as stated

EXHIBIT B

OFFICE OF THE PRESIDENT

WELLESLEY HILLS CAMPUS:
50 Oakland Street
Wellesley Hills, MA 02481

781.239.3100
781.237.1061



MASSBAY
COMMUNITY COLLEGE

June 2, 2002

Dr. Judith I. Gill
Chancellor
Board of Higher Education
One Ashburton Place
Boston, MA

Dear Judy:

I am herewith alerting you to two personnel actions now taking place at MassBay that could become highly litigious and/or public. I alert you to avoid any surprises for you or the Board of Higher Education.

For almost the entire three years that I have been President at MassBay, I have had to deal with some very unacceptable behavior from two tenured professors there. Both are minorities – one black and the other Indian. Over the course of the last couple years, the College has instituted progressive discipline of these professors while attempting to correct the most egregious of the problems with their performance. One professor was even suspended for three days without pay just last month for repeatedly violating the rights of a fellow faculty member.

More recently, and in response to a number of student complaints, we have determined that each professor has failed to supervise their classes, changed class schedules without authority, and exposed students to unsafe laboratory situations, to name but few problems with these faculty. These recent occurrences have now led to the College taking action to terminate the employment of the two professors. The recent performance history for each individual is summarized in the enclosed materials.

Professor Panse has been officially served with his dismissal notice. Professor Jackson is out of state and should be served this week. They each will have the opportunity for a formal hearing with me. They then can request a hearing with you or your designate.

Please let me know if you need more information on these matters.

Sincerely,

Lindsay D. Norman
President

www.mbcc.mass.edu

```
                                        Volume: IX
                                        Pages: 1 - 89

                    COMMONWEALTH OF MASSACHUSETTS
                       AMERICAN ARBITRATION ASSOCIATION
                                    DAY 9
                    ********************
                    MASSACHUSETTS COMMUNITY
                    COLLEGE COUNCIL,
                             Plaintiff,

                    AND                   11 390 02407 02


                    BOARD OF HIGHER EDUCATION,
                             Defendant.
                    ********************


                    BEFORE:  Michael W. Stutz, Esq.
                             Arbitrator


                    AT:  American Arbitration Association
                         133 Federal Street
                         Boston, Massachusetts


                         Thursday, February 19, 2004




                                EILEEN BAKER
                       REGISTERED PROFESSIONAL REPORTER
                              18 WEBSTER STREET
                             WEYMOUTH, MA 02190
                     TEL. (781) 335-7655  *  FAX (781) 340-2454
```

APPEARANCES:

SHAEVEL & KREMS
(By Daniel O'Connor, Esq.)
141 Tremont Street
Boston, Massachusetts 02111
  On behalf of the Massachusetts Community
  College Council

THE COMMUNITY COLLEGES OF MASSACHUSETTS
Office of Community College Counsel
(By Haidee E. Morris, Esq.)
Middlesex Community College
Bedford Campus
Spring Road
Bedford, Massachusetts 01730
  On behalf of the Board of Higher
  Education

```
                          I N D E X

    WITNESS:         DIRECT/          CROSS/
                     REDIRECT         RECROSS

    Lindsay Norman
    By Mr. O'Connor   7/68
    By Ms. Morris                     38
```

P-R-O-C-E-E-D-I-N-G-S
  At the American Arbitration Association, 133 Federal Street, Boston, Massachusetts, on Thursday, February 19, 2004, commencing at 11:18 a.m.
  THE ARBITRATOR: Good morning. Before going on the record the union proposed a deposition of some sort to enter into the record and the employer is objecting, so I'll let you do that.
  MS. MORRIS: Yes. The employer objects on several grounds. First, there is no indication that this is a deposition. The employer was not called to any depositions with the opportunity to cross-examine this witness. There is no showing that this witness is unavailable to testify.
  This is not a witness that to the best of the college's recollection was a party or appeared at the underlying hearing, nor was the deposition or any deposition or affidavit introduced at the underlying hearing to the best of the college's recollection.

**33**

| | | |
|---|---|---|
| 1 | | hearing concluded on July 30th how long did |
| 2 | | you deliberate before making the decision to |
| 3 | | dismiss him? |
| 4 | A | Oh, at least a couple of days. |
| 5 | | MR. O'CONNOR: If I could show the |
| 6 | | witness Employer Exhibit 25, please. |
| 7 | | (Document handed to witness.) |
| 8 | Q | Do you recognize this e-mail, sir? |
| 9 | A | I do, yes. |
| 10 | Q | It's an e-mail to the Board of Trustees from |
| 11 | | yourself; is that right? |
| 12 | A | Not exactly. |
| 13 | Q | Can you just tell me who the e-mail is |
| 14 | | addressed to? |
| 15 | A | It is addressed to three members of the Board |
| 16 | | of Trustees who serve on the personnel, |
| 17 | | finance and audit committee of that board. |
| 18 | Q | What was the purpose behind sending this |
| 19 | | e-mail? |
| 20 | A | The responsibilities of the trustees for all |
| 21 | | personnel actions at the college have been |
| 22 | | delegated to the president of the college. |
| 23 | | However, the language in the statute and the |
| 24 | | bylaws of the trustees says that the |

**34**

| | | |
|---|---|---|
| 1 | | president will keep the board informed of |
| 2 | | major personnel actions that he may authorize |
| 3 | | or take in his role as president. |
| 4 | | This particular e-mail was |
| 5 | | authorizing the chairman of the board, the |
| 6 | | vice chairman of the board and the chairman |
| 7 | | of the finance personnel and audit committee |
| 8 | | and the other trustee who is a member of that |
| 9 | | committee that I likely would be pursuing -- |
| 10 | | I don't know whether I say I am going to |
| 11 | | pursue or likely, and I'm referring it to |
| 12 | | them for information purposes in the event |
| 13 | | that they wanted to discuss it with me or had |
| 14 | | any reason to have questions about these |
| 15 | | actions, and I was doing so pursuant to the |
| 16 | | delegation that the board has given me. |
| 17 | Q | If you would look at the paragraph, the first |
| 18 | | paragraph after the itemization of the |
| 19 | | charges, do you see that? |
| 20 | A | Yes. |
| 21 | Q | The last sentence of that paragraph indicates |
| 22 | | that you're preparing to send a notice of |
| 23 | | termination to the employee? |
| 24 | A | Okay. |

**35**

| | | |
|---|---|---|
| 1 | Q | Is that correct? |
| 2 | A | Okay. Yes. |
| 3 | Q | So, you had made your decision by the time |
| 4 | | you had drafted this e-mail? |
| 5 | A | Probably at 12:30 p.m. on July 31. |
| 6 | Q | That was the next day after the conclusion of |
| 7 | | the hearing; is that correct? |
| 8 | A | Was it? I don't know. |
| 9 | | MR. O'CONNOR: Could we show the |
| 10 | | witness I believe it's Employer 17. |
| 11 | | THE ARBITRATOR: I'm showing the |
| 12 | | witness Employer Exhibit 17 which is a |
| 13 | | transcript of a hearing on July 30, 2002. |
| 14 | | (Document handed to witness.) |
| 15 | | MR. O'CONNOR: I'm sorry, could you |
| 16 | | show him 17 again. |
| 17 | | (Document handed to witness.) |
| 18 | Q | If you could look at page 162 of the |
| 19 | | transcript. |
| 20 | A | I'm sorry, 162? |
| 21 | Q | 162. |
| 22 | A | Yes. |
| 23 | Q | You note that the hearing concluded at 3:50 |
| 24 | | p.m. on July 30th? |

**36**

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | So, at the time you sent the e-mail to the |
| 3 | | members of the Board of Trustees it had been |
| 4 | | less than 24 hours since the conclusion of |
| 5 | | the hearing; is that right? |
| 6 | A | According to this chronology, yes. |
| 7 | Q | So, do you recall -- I don't know if that |
| 8 | | refreshes your recollection about how long |
| 9 | | you deliberated over the dismissal decision. |
| 10 | A | My earlier response said a day or two and |
| 11 | | this would appear to be somewhat less than |
| 12 | | one day. |
| 13 | Q | Can you define it any more? Was it an hour, |
| 14 | | was it two hours? |
| 15 | A | When the hearing concluded on I believe that |
| 16 | | was July 30th I thought about little else for |
| 17 | | most of that day and evening and the next |
| 18 | | morning. |
| 19 | Q | So, it was several hours you considered it? |
| 20 | A | Oh, absolutely. |
| 21 | Q | Did you have the transcripts available to you |
| 22 | | to review while you made the decision on the |
| 23 | | dismissal? |
| 24 | A | I did not. |

65

1 but it's in front of you is dated July 31st?
2 A It's dated August 2, 2002.
3 Q Now, you testified that this issue was
4     foremost on your mind after the hearing; is
5     that right?
6 A Almost to the exclusion of anything else.
7 Q How fresh was the evidence and testimony that
8     you had heard at the time that you made your
9     deliberations?
10 A My intent at the time was to make a decision
11    because the information was very fresh in my
12    mind, and to make that decision as
13    expeditiously as I could while that
14    information was current.
15 Q Now, you testified just a moment ago that you
16    believe that an employee should be given a
17    chance to fix their behavior I believe, words
18    to that effect. My question is why did you
19    make a decision to terminate Dr. Panse rather
20    than impose some lesser sanction?
21 A As a result of the hearing I was consciously
22    looking for what the employee's, not only
23    what the employee's response was to these
24    charges, but had the employee made a

66

1 conscious effort to comply with the college
2 policies that underlay these charges, such as
3 the supervision of the laboratory and meeting
4 class times and being there during scheduled
5 classes and so forth.
6     I was always looking for the
7 opportunity and was anxiously waiting to hear
8 the statement that if I have made a mistake
9 what do I need to resolve that mistake. If I
10 have been wrong and it would appear that I
11 have been in relation of the policies or the
12 procedures, please tell me what do I need to
13 do to correct those.
14     I sensed during the early
15 investigation that Dr. Gastenveld and
16 Associate Dean Sabbagh and Dean Darkazalli
17 had conducted that the employee had not taken
18 that attitude, in light of what I viewed to
19 be fairly explicit verbal instructions to the
20 employee to supervise the classroom, to
21 attend to the safety of the students, to meet
22 the class at scheduled times and to teach the
23 course as outlined in the catalog and other
24 places.

67

1     I instead got the impression that
2 the employee said I refuse to do that on more
3 than one occasion. As a result of the
4 hearing and having that substantiated by the
5 employee, by Dr. Panse, I, at the end of the
6 hearing, was of the mind that we were dealing
7 with a blatant and gross insubordination
8 situation here, and given the opportunity to
9 correct the behavior that had been repeatedly
10 shared with Dr. Panse and his disregard for
11 those instructions, I was left with no other
12 conclusion than to assume that the employee
13 had no intention of changing his behavior,
14 did not see that he had to comply with
15 college policies and procedures and that had
16 total disregard for the safety of the
17 students, and that was -- that ended up being
18 my bottom line at the end of the hearing. I
19 heard nothing during the hearing to indicate
20 any indication of corrective action.
21     THE ARBITRATOR: I don't understand.
22 To indicate any indication of corrective
23 action?
24     THE WITNESS: I will supervise the

68

1 students in the laboratory or I won't do it
2 from afar. I will meet my class at assigned
3 times. I will comply with the contractual
4 requirement of my employment.
5     MS. MORRIS: I have no further
6 questions.
7     (Brief recess.)
8     REDIRECT EXAMINATION
9 BY MR. O'CONNOR:
10 Q You testified that your position before you
11    came to Mass. Bay was at Montana Tech; is
12    that correct?
13 A That's correct.
14 Q What years did you hold that position?
15 A 1986 to 1998.
16 Q When did you leave Montana Tech, what month
17    in that year?
18 A June of '98.
19 Q So, from June of '98 until March of '99 when
20    you came to Mass. Bay you were unemployed?
21 A That's not correct.
22 Q Did you retire from the job at Montana Tech?
23 A I did not.
24 Q Did you resign?

## AMERICAN ARBITRATION ASSOCIATION
## ARBITRATOR'S OPINION & AWARD

Before Michael W. Stutz, Arbitrator

---

In the Matter of Arbitration between

**MASSACHUSETTS COMMUNITY COLLEGE COUNCIL/
MTA/NEA**

-and-

**BOARD OF HIGHER EDUCATION,**
**Massachusetts Bay Community College**

*Panse Dismissal*
*Merits*
*AAA Case No. 1139-2407-02*

---

### AWARD of the ARBITRATOR

The undersigned arbitrator, having been designated in accordance with the Parties' arbitration agreement, and having duly heard the proofs, allegations and contentions of the Parties, AWARDS as follows:

1. There was no just cause for the dismissal of the grievant.
2. The President's decision to dismiss the grievant was arbitrary, capricious or unreasonable based on clear and convincing evidence.
3. The matter is remanded for reassessment of the original decision by the President of the College.
4. The undersigned hereby retains jurisdiction in accordance with the Agreement.

November 9, 2004             Michael W. Stutz

If the administration considers the grievant's lab design as described above to be unacceptable, it may communicate this view to the grievant and give him an opportunity to bring his program up to acceptable levels before imposing discipline.

In this case, the administration investigated the grievant's Rotation II, got some complaints from students and then solicited interviews with all of the students, and from these many interviews the charges were fashioned and brought. Although the grievant's personnel file includes memoranda about scheduling issues in the past between the grievant and the prior dean, these documents are neither a directive nor discipline. Therefore, the grievant was not on notice that he must change his program or face discipline and discharge. The absence of notice to the grievant prevents there being just cause to discipline, much less to discharge the grievant.

The fact that the grievant was discharged in the middle of litigation against the College raises the possibility that the grievant's firing was related to the litigation. The performance charges were unsupported by prior notice to the grievant or the usual evaluation procedures. Although Rotation II in the spring of 2002 had some difficulties, these problems were not so egregious as to form a basis to terminate this tenured professor without any prior discipline or other efforts by the administration to solve the problems with the course. After reviewing all of the evidence, I conclude that the College did not have just cause to terminate the grievant.

### The President's decision to terminate the grievant was arbitrary, capricious and unreasonable

Having concluded that there was no just cause to terminate the grievant, we next consider whether the President's decision was arbitrary, capricious or unreasonable, that is whether President Norman had reason to terminate the grievant, or, rather, whether the decision was arbitrary, capricious or unreasonable.

18

**EXHIBIT F**

## Panse, Dr. Chandrakant

**From:** Panse, Dr. Chandrakant
**Sent:** Monday, October 30, 2006 2:01 PM
**To:** Berotte Joseph, Dr. Carole; Berrien, Steve; Darkazalli, Ghazi; Khudairi, Tala
**Cc:** Jackson, Bruce
**Subject:** Fighting fraud in education

Dear All,

During the first lecture of my organic chemistry (CH 201) class this Fall, I told the students that no course of mine would ever be watered-down community college version of education, and that I was not going to be a party to any of MassBay's frauds in the name of education.

I have been aware, and have been complaining, for a very long time that this College's CH 201-202, organic chemistry I-II, sequence has not been truly transferable to senior institutions. MBCC's credits for these courses would be accepted by, say, UMass Amherst, but only as "general education" credits. As a result, our students interested in majors such as biology or environmental sciences would be forced to repeat two semesters of organic chemistry at UMass, their "A"s in MassBay's organic chemistry notwithstanding.

In comparison, this College's A&P I-II (anatomy and physiology) courses are known for their standards and transferable as A&P, unlike those at some other community colleges.

Thus, I told the class, this College's "joint admission" program with UMass and the public claims about the education here have been fraudulent, at least in part.

Although my information is dated, I told the class, I have no reason to believe that anything has improved here in the 3 year long absence of Dr Jackson and me from the College; to the contrary, things have gone seriously downhill.

I went on to inform the class that I had been able to rectify this troubling state of affairs whenever I taught organic in the past, by teaching to nationwide standards, and by using for the Final Examination here a standardized test prepared by the American Chemical Society and used nationwide by major research universities.

I assured the class that when I write a letter for them about the standards in my organic chemistry course, they should have no difficulty in transferring their credits as organic chemistry credits; such has been the past practice, although I obviously could make no guarantees.

The opposition of my faculty colleagues' to such a uniform teaching standard across the discipline of chemistry, on spurious "academic freedom" grounds, has been legendary for more than a decade, leading to departmental discussions of proposals of new and different organic chemistry sequence for biotech (and life sciences) majors.

When I negotiated an agreement with UMass to have our chemistry credits transferred as their chemistry credits, this College did what it did best. It retaliated, in the name of academic integrity no less.

Another problem I have often brought up in department faculty meetings is the significantly more time

11/3/2006

allocated to 4 credit chemistry classes at major schools compared to community colleges happy with a culture of faculty-management conflicts. That issue, as you know or should know, has become particularly acute this semester.

As the going starts getting progressively more demanding for my students, particularly when they compare easy "A"s they could get with other instructors, the flow of student grumblings to this complaint-seeking administration cannot be far.

I respectfully remind you that it is your burden, pursuant to College protocols and practices, to satisfy yourselves that a complaining student has taken adequate measures to first address any issues directly with the faculty.

Rather, it is critical to bear in mind at all times what a critical part such adherence to national educational standards has played in the past glories achieved here. Your support in this regard is essential.

Thank you.

C. Pansé

11/3/2006